UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| ELITE PRECISION CUSTOMS LLC, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*, <br><br> *Defendants*. | No. 4:25-cv-00044-P |

**BRIEF OF DEFENDANTS IN SUPPORT OF MOTION TO DISMISS**

## **TABLE OF CONTENTS**

**INTRODUCTION** ............................................................................................................. 1

**STATUTORY AND REGULATORY BACKGROUND** ......................................................... 2

**FACTUAL BACKGROUND** ............................................................................................... 6

**LEGAL STANDARDS** ...................................................................................................... 7

**ARGUMENT** ..................................................................................................................... 8

**CONCLUSION** ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*,
  50 Tenn. 165 (2009) .................................................................................................... 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................... 7

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................................................. 8, 9

*Founding. United States v. Libertad*,
  681 F. Supp. 3d 102 (S.D.N.Y. 2023) ....................................................................... 10

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ..................................................................................... 10

*Lujan v. National Wildlife Fed.*,
  497 U.S. 871 (1990) .................................................................................................. 14

*Mance v. Sessions*,
  896 F.3d 699 (5th Cir. 2018) ............................................................................... 13, 14

*Maryland Shall Issue, Inc. v. Moore*,
  116 F.4th 211 (4th Cir. 2024) (en banc) ................................................................... 15

*McDonald v. City of Chicago, Ill.*,
  561 U.S. 742 (2010) .................................................................................................... 9

*McRorey v. Garland*,
  99 F.4th 831 (5th Cir. 2024) .................................................................................. 9, 15

*Nat'l Rifle Ass'n v. Brady*,
  914 F.2d 475 (4th Cir. 1990) ...................................................................................... 5

*New York State Rifle & Pistol Assn., Inc. v. Bruen*,
  597 U.S. 1 (2022) ............................................................................................... passim

*Ortega v. Lujan-Grisham*,
  741 F. Supp. 3d 1027 (D. N.M. 2024) ...................................................................... 15

*Reese v. ATF*,
  127 F.4th 583 (5th Cir. 2025) ................................................................................... 14

*Teixeira v. County of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ............................................................................... 10, 11

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) .................................................................................... 7

*United States v. Holton*,
    639 F. Supp. 3d 704 (N.D. Tex. 2022) ............................................................... 11, 13

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ....................................................................................... 13

*United States v. Rahimi*,
    602 U.S. 680 (2024) ..................................................................................... 8, 9, 10

*United States v. Salerno*,
    481 U.S. 739 (1987) .................................................................................................. 8

**U.S. Constitution**

U.S. Const. amend. II ........................................................................................................ 8

**Statutes**

1 Trumbull,
    *Public Records of the Colony of Connecticut*, 138-39, 145-46 ............................. 11

15 *The Public Records of the Colony of Connecticut* 191 (1890) ................................. 12

18 U.S.C. § 922 ......................................................................................................... *passim*

18 U.S.C. § 923 ..................................................................................................................... 2

18 U.S.C. § 926 ..................................................................................................................... 5

1652 N.Y. Laws 128 ........................................................................................................... 12

1811 N.J. Laws 300 ........................................................................................................... 13

1814 Mass. Acts 464 Ch. 192, Section 2 ........................................................................... 13

1820 N.H. Laws 274 ........................................................................................................... 13

1968 U.S.C.C.A.N. 2112 (1968) ..................................................................................... 4, 5

1968 U.S.C.C.A.N. 4410 (1968) .................................................................................. 3, 4, 5

*Colonial Laws of Massachusetts Reprinted from the Edition of 1672* (1890) ............. 12

Countrie of Virginia, Mar. 22, 1651, 1 Henning 365 ..................................................... 11

Gun Control Act of 1968,
    Pub. L. No. 90-618, 82 Stat. 1213 (1968) ................................................. 3, 4, 13, 14

*Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October*,
    *One Thousand Seven Hundred* (1810) ................................................................... 12

Omnibus Crime Control and Safe Streets Act of 1968,
    82 Stat. 225 (1968) ..................................................................................... 3, 4, 13, 14

Laws of the State of Maine § 1821, Vol. 2, section 3 ................................................................ 11

Laws of Va., Feb. 1676-77, Va. Stat. at Large,
   2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (1823) ........................ 11

Homeland Security Act of 2002,
   Pub. L. No. 107-296, 116 Stat. 2135 ................................................................................... 5

Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Guns in New Netherland by Private Persons,
   1652 N.Y. Laws 128 ........................................................................................................... 12

Proceedings for the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776 ................................................................................................................ 12

The Statutes At Large of South Carolina, No. 408, IV (1719) ..................................................... 12

Virginia Act of Feb. 27, 1631, Act LVI, 1 Henning 174-75 ......................................................... 11

Waverly K. Winfree,
   *Being a Supplement to Hening's The Statutes At Large*, at 182 (1971) .................................. 11

## Regulations

27 C.F.R. § 478.96 .................................................................................................................. 5, 6
27 C.F.R. § 478.99 ............................................................................................................... 2, 5, 7
27 C.F.R. § 478.124 .................................................................................................................... 6

## Other Authorities

National Firearms Commerce and Trafficking Assessment (NFTCA) ...................................... 14
S. Rep. No. 89-1866 (1966) .................................................................................................... 3, 4
William J. Novak, The People's Welfare, Law and Regulation in Nineteenth Century America 87 (1996) ...................................................................................................................................... 10

## **INTRODUCTION**

Plaintiffs challenge the constitutionality of the federal regulatory regime that channels each out-of-state handgun purchase through a federal firearms licensee (FFL), which has regulated the direct sale of handguns to out-of-state consumers for more than a half century. That regime unquestionably burdens the fundamental right to keep and bear arms, and Defendants acknowledge that courts must carefully scrutinize burdens on the right to ensure compliance with the Second Amendment. In this instance, though, the law passes constitutional muster. The challenged regime facilitates compliance with state law and advances Congress's interests in precluding dangerous individuals and criminals from obtaining handguns. At the same time, it only modestly burdens the right to keep and bear arms, serves legitimate objectives, and aligns with the nation's regulatory tradition of regulating firearm ownership. Nothing in that framework, for example, prohibits the purchase of any type of handgun for any lawful purpose. The challenged regime, on the whole, is the type of firearm regulations that the Supreme Court identified as "presumptively lawful" in *Heller*, *McDonald*, *Bruen*, and *Rahimi*. It is also in keeping with a historical tradition from England, the colonies, and the Founding of government regulation, including commercial regulation, to ensure only law-abiding citizens obtained and possessed firearms, and to keep potentially dangerous individuals from obtaining them.

The challenged regime complements each state's handgun regulation regime and permissibly "ensure only that those bearing arms in the jurisdiction are, in fact, law abiding, responsible citizens." *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022) (citation omitted).

For these reasons, as explained further below, the Court should dismiss Plaintiffs' Complaint.

## STATUTORY AND REGULATORY BACKGROUND

Congress has enacted a vast, interconnected framework of federal laws regulating the interstate firearm market. Plaintiffs' suit challenges a central part of that framework: 18 U.S.C. §§ 922(a)(3), (a)(5), (b)(3), and 27 C.F.R. § 478.99(a).

Federal law requires anyone "in the business of importing, manufacturing, or dealing in firearms" to obtain a license to do so from the Attorney General. 18 U.S.C. §§ 922(a), 923. The challenged laws work in tandem to prohibit the interstate transfer of firearms except through federal firearms licensees.[1]

---

[1] Section 922(a)(3) reads: "It shall be unlawful … for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter."

Section 922(a)(5) reads: "It shall be unlawful …for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes."

Section 922(b)(3) reads: "It shall be unlawful  for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver … any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the

2

Congress enacted the Omnibus Crime Control Act following a multi-year investigation of violent crime, which revealed "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." Omnibus Crime Control and Safe Streets Act of 1968 ("Omnibus Crime Control Act"), Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. 225. Those existing federal controls included requirements that firearms dealers obtain licenses, keep customer records, and made illegal the transfer of firearms to certain classes of people, including convicted felons. Federal Firearms Act of 1938, Pub. L. No. 75-785, Ch. 850, 52 Stat. 1250 (repealed 1968). But the 1938 Act was insufficient to prevent interstate trafficking of firearms. Congress specifically noted "the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." S. Rep. No. 89-1866, at 19 (1966). Accordingly, Congress enacted a comprehensive framework for regulating interstate commerce in firearms. Congress later built on this regulatory framework by enacting the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, the "principal purpose" of which was "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, reprinted in 1968 U.S.C.C.A.N. 4410, 4411 (1968). In so doing, Congress enabled states to adopt stronger controls over firearms if they so choose.

---

licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes."

Congress's investigations revealed that "[n]ot only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, *primarily handguns*, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention." S. Rep. No. 89-1866, at 3 (App. 001) (emphasis added). Congress established that "[c]ircumvention of the laws of the District of Columbia was easily effected by" the interstate transfer of handguns and this problem was emblematic of the problems in all states. *Id*. at 61. For example, Massachusetts state police "traced 87 percent of the concealable firearms used in crimes in the state to out-of-State purchases." *Id*. at 61. In Atlanta, 80 percent of firearms seized pursuant to their use in the commission of crimes came from out-of-state. *Id*. at 55.

Congress thus found that "concealable weapons" presented a particular challenge for state and local law enforcement authorities, Pub. L. No. 90-351, Title IV, § 901(a)(2), (4), (5), (6), 82 Stat. at 225, and that "the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms." *Id*. § 901(a)(5), 82 Stat. at 225. Congress found "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." *Id.* § 901(a)(3), 82 Stat. at 225.

To that end, Congress included statutory provisions in both the Omnibus Crime Control Act and the Gun Control Act "designed to prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one" and to facilitate law enforcement by state authorities for violations of gun control laws by ensuring that transfers did

4

not take place out of state where police did not have jurisdiction. H.Rep. No. 90-1577, 1968 U.S.C.C.A.N. at 4420; *see also* S. Rep. No. 90-1097, reprinted in 1968 U.S.C.C.A.N. 2112, 2114. These provisions include 18 U.S.C. §§ 922(a)(1)-(5), which require interstate transfers of firearms to take place through federal firearms licensees, and 18 U.S.C. § 922(b)(3), which regulates the interstate transfer of firearms by federal firearms licensees.

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is authorized to issue "such rules and regulations as are necessary to carry out" the provisions of Title 18 relating to firearms. 18 U.S.C. § 926(a); *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 477 (4th Cir. 1990) ("The Secretary of the Treasury was authorized to promulgate regulations to facilitate the enforcement of the Gun Control Act" and "[t]his responsibility was delegated within the Department of the Treasury to the Bureau of Alcohol, Tobacco and Firearms (BATF).").[2]

ATF's implementing regulations include 27 C.F.R. § 478.99(a), which closely tracks Congress's limitations on interstate transfers of firearms by federal firearms licensees, 18 U.S.C. § 922(b)(3).[3] ATF also has provided that federal firearms licensees "shall not sell or otherwise

---

[2] The Homeland Security Act of 2002 divided the Bureau of Alcohol, Tobacco and Firearms into two separate agencies, the Bureau of Alcohol, Tobacco, Firearms and Explosives within the Department of Justice, and the Tax and Trade Bureau within the Department of Treasury. Homeland Security Act of 2002, Pub. L. No. 107-296, § 1111, 116 Stat. 2135, 2274. The Act transferred the Bureau's authority under the Gun Control Act to the new ATF in the Department of Justice and amended the Gun Control Act by replacing references to the Secretary of the Treasury with references to the Attorney General. *Id*.

[3] The regulation at 27 C.F.R. § 478.99(a) provides that a federally-licensed importer, manufacturer, dealer, or collector "shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business or activity is located." *Id*. The regulation does not apply to the "sale or delivery of a rifle or shotgun" if ATF's requirements for mail order sales, id. § 478.96(c), "are fully met." *Id*. § 478.99(a)(1). The regulation also does not "apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes." *Id*. § 478.99(a)(2).

dispose, temporarily or permanently, of any firearm to any [unlicensed transferee], unless the licensee records the transaction on a firearm transaction record, Form 4473." 27 C.F.R. § 478.124(a); *see also* 27 C.F.R. § 478.96 (imposing same restrictions with respect to mail order sales). The Form 4473 establishes the transferee's identity as well as his or her eligibility to possess a firearm by documenting "the transferee's name, sex, residence address," "date and place of birth," "height, weight, and race," "country of citizenship," "State of residence," and the transferee's certification that he or she "is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce." 27 C.F.R. § 478.124(c)(1) (emphasis added).[4]

Under this regulatory framework, a person who is eligible to possess a handgun may purchase a handgun through an in-state FFL or purchase one from an out-of-state source by arranging for the handgun to be delivered to an in-state FFL, from whom the purchaser may retrieve the handgun. 18 U.S.C. § 922(b) (providing that "[p]aragraphs (1), (2), (3), and (4) of this subsection shall not apply to transactions between" federal firearms licensees).

## FACTUAL BACKGROUND

Plaintiffs allege the following facts, which are taken as true solely for purposes of this motion. Plaintiff Tim Herron is a resident of New Mexico who travels out-of-state frequently to

---

[4] *See also* 27 C.F.R. § 478.124(d) (requiring completion of a Form 4473 prior to "an over-the-counter transfer of a shotgun or rifle . . . to a nonlicensee who is not a resident of the State in which the licensee's business premises is located"); *id*. § 478.124(e) (same, with respect to "transfer of a firearm to any nonlicensee who is not a resident of the State in which the licensee's business premises is located, . . . [but] is acquiring the firearm by loan or rental from the licensee for temporary use for lawful sporting purposes"); *id*. § 478.124(c) (same, for an "over-the-counter transfer of a firearm to a non-licensee who is a resident of the State in which the licensee's business premises is located").

conduct firearms training classes. Complaint ("Compl.") ¶ 7, 22-25 (ECF No. 1). He purchases a handgun while traveling one or two times a year and arranges for it to be delivered to an FFL located in Albuquerque, New Mexico. *Id*. However, because of the challenged provision, Herron chooses not to purchase a handgun from Elite Precision in Texas and arrange for it to be delivered to an FFL in New Mexico. *Id*. ¶¶ 22-25. Plaintiff Freddie Blish is a resident of Arizona who travels out-of-state to teach courses in handgun self-defense. *Id*. ¶¶ 8, 26-27. He chooses not to purchase a handgun on his travels and arrange for it to be transferred to an FFL in Arizona but would purchase a handgun from Elite Precision in Texas if not for the challenged provisions. *Id*. Plaintiff Elite Precision is a licensed firearms retailer located in Mansfield, Texas that wishes to sell handguns to out-of-state customers. *Id*. ¶¶ 26-27. Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a nonprofit membership organization incorporated under the laws of Delaware that seeks to "protect the means by which individuals may exercise the right to carry and use firearms" through litigation, among other methods. *Id*. ¶ 9. FPC proceeds on behalf of its members but identifies no members other than the other named Plaintiffs. *Id*.

## LEGAL STANDARDS

Claims are subject to dismissal pursuant to Rule 12(b)(6) if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A Rule 12(b)(6) motion should be granted if "it appears certain that the plaintiff cannot prove any set of facts that would entitle it to the relief it seeks." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005) (citation omitted).

Plaintiffs bring a facial challenge to sections 922(a)(3), (a)(5), (b)(3), and 27 C.F.R. § 478.99(a). *See* Compl. at 12 (requesting declaratory judgement that the challenged laws violate

the Second Amendment and seeking a permanent injunction banning their enforcement). This is the "'most difficult challenge to mount successfully,' because it requires a [plaintiff] to 'establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Rahimi*, 602 U.S. 680, 694 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

## ARGUMENT

**The federal interstate-transfer regulatory framework is not facially unconstitutional under the Second Amendment**

**A.** The Second Amendment declares that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. And while purchasing arms is not "keep[ing]" or "bear[ing]" arms, it is a fundamental incident of that right, and thus, within the scope of conduct protected by the Second Amendment. *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them[.]").

"'Like most rights,' though, '"the right secured by the Second Amendment is not unlimited."'" *Bruen*, 597 U.S. at 24 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Where, as here, the government regulates the right to keep and bear arms, it bears the burden of showing that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. "Why and how the regulation burdens the right are central to this inquiry." *Rahimi*, 602 U.S. at 692. That inquiry does not render constitutional only laws that mirror historical laws. *Id*. at 30. Rather, courts will often have to "reason[] by analogy" to conduct the historical inquiry. *Id*. at 29. In so doing, the courts should consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that the tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). The government is required only to

8

"identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30 (emphasis in original).

The Supreme Court has emphasized that longstanding "laws imposing conditions and qualifications on the commercial sale of arms" are presumptively constitutional. *Heller*, 554 U.S. at 626-27; *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010); *see also Bruen*, 597 U.S. at 31; *id.* at 81 (Kavanaugh, J., concurring) (quoting *Heller*); *Rahimi*, 602 U.S. at 699 (quoting *Heller*'s "presumptively lawful" language). If, for example, a commercial regulation of the right were "put towards abusive ends," *McRorey v. Garland,* 99 F.4th 831, 834, 840 (5th Cir. 2024) (quoting *Bruen*, 597 U.S. at 38 n. 9), the regulation would not be permissible. While neither the Supreme Court nor the Fifth Circuit has set forth the full range of criteria for "abusive ends," in *Bruen,* the Court offered as examples lengthy wait times in processing license applications or exorbitant fees that have the effect of denying citizens the right to public carry. *Bruen*, 597 U.S. at 38 n. 9. And in *McRory*, the Fifth Circuit recognized the possibility that lengthy background checks would trigger such scrutiny, but "a period of 10 days does not qualify." 99 F.4th at 840.

The Fifth Circuit's decision in *McRorey* bears emphasis. There, the Fifth Circuit denied a Second Amendment challenge to the federal background check system for 18-to-20-year-olds that required them to wait up to 10 business days to purchase a firearm. *Id.* at 834-35. The Fifth Circuit emphatically rejected the argument that such delay on the commercial purchase of a firearm while a background check remains pending violates the Second Amendment. "Our law is plain as can be that some amount of time for background checks is permissible." *Id.* at 839. The Fifth Circuit accordingly held that the background check requirements, which regulate both purchase and sale, are constitutional, even though those background checks may delay an individual's ability to purchase and a seller's ability to sell a firearm. *Id.*

**B.** The challenged regime here likewise only modestly burdens Second Amendment rights and is "consistent with the principles that underpin our regulatory tradition [of firearms]." *Rahimi*, 602 U.S. at 692. It merely channels handgun purchases through FFLs, modestly delaying the time an individual who purchases a handgun while out-of-state may take delivery of a handgun. That regime deters the sale of firearms to dangerous persons and discourages the evasion of state law. It also does not prohibit the purchase of any type of handgun for any lawful purpose.

**1.** The historical tradition of government regulation to ensure only law-abiding citizens acquire firearms dates back to pre-colonial English practice and extends through the colonial period and beyond the Founding. *United States v. Libertad*, 681 F. Supp. 3d 102, 114-15 (S.D.N.Y. 2023) (citing *Kanter v. Barr*, 919 F.3d 437, 457-58 (7th Cir. 2019) (Barrett, J., dissenting). Various levels of government have long preserved the peace and welfare of the community by exercising sovereign power to regulate the commercial sale of products. William J. Novak, The People's Welfare, Law and Regulation in Nineteenth Century America 87 (1996) ("[E]arly Americans understood the economy as simply another part of their well-regulated society, intertwined with public safety, morals, health, and welfare and subject to the same kinds of legal controls."). Firearms were no exception. "[C]olonial governments substantially controlled the firearms trade." *Teixeira v. County of Alameda*, 873 F.3d 670, 684-85 (9th Cir. 2017) ("Neither of [Blackstone's or Tucker's] authoritative historic accounts states or implies that the English Bill of Rights encompassed an independent right to engage in firearms commerce."); *see generally Bruen*, 597 U.S. at 20 (noting significance of "American colonial views leading up to the founding").

In contrast to the modest limits at issue here, some of the historical analogues entirely foreclosed commercial transactions with out-of-state individuals and others. Since the time of the

Founding, states have regulated how firearms and gunpowder can be traded and transported, particularly across state lines. *See United States v. Holton*, 639 F. Supp. 3d 704, 711 (N.D. Tex. 2022). From the seventeenth century through the Founding, numerous colonies and states had direct or indirect prohibitions on the sale of firearms to individuals not from the jurisdiction. In 1642, Connecticut banned the sale of firearms by its residents outside the colony. *Teixeira*, 873 F.3d at 685 (citing 1 Trumbull, *Public Records of the Colony of Connecticut*, 138-39, 145-46). Connecticut again banned all sales of firearms to "any person inhabiting outside of this jurisdiction" in 1650 to address the problem that those they deemed dangerous, Native Americans, had been able to acquire firearms. III. The First Code of Laws, May 1650, J. Hammond Trumbull, *True-Blue Laws of Connecticut and New Haven and the False Blue-Laws Invested by the Rev. Samuel Peters*, at 92 (1876). Virginia followed Connecticut's lead when it adopted a law providing that all persons were at "liberty to sell armes and ammunition to any of his majesties loyal subjects inhabiting *this colony*." Laws of Va., Feb. 1676-77, Va. Stat. at Large, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 403 (1823) (emphasis added). But that liberty to sell arms did not extend to selling arms to those not from the colony. *Id*. Virginia also created a registration regime that required the recording of all new arrivals to the colony, including their arms and munitions. Virginia Act of Feb. 27, 1631, Act LVI, 1 Henning 174-75; Articles at the Surrender of the Countrie of Virginia, Mar. 22, 1651, 1 Henning 365. In 1720, Virgina also restricted residents of the counties of Spotsylvania and Brunswick from transporting firearms outside the county. An Act for Erecting the Countys of Spotsylvania and Brunswick and granting certain Exemption and Benefits to the Inhabitants thereof (1720), Waverly K. Winfree, *Being a Supplement to Hening's The Statutes At Large*, at 182 (1971). South Carolina completely banned the export of all firearms,

including through sale. The Statutes At Large of South Carolina, No. 408, IV (1719), at 101. Maryland did the same in 1776, banning the export of all firearms unless the owner was permanently relocating outside the jurisdiction. Proceedings for the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776, at 147. New York was an outlier in that it went even further—banning entirely the private trade of gunpowder, lead, and guns within the colony. Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Guns in New Netherland by Private Persons, 1652 N.Y. Laws 128.

Commercial regulations of the colonies and early states also extended to the export and sale of gunpowder, which "was essential to the operation of firearms at the time, meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller v. Bonta*, No. 19 Civ. 1537 (S.D. Cal. 2022) (Dkt. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf. Bruen*, 597 U.S. at 58 (citing article by Cornell). Massachusetts and Connecticut prohibited the export of gunpowder without a license. *See Colonial Laws of Massachusetts Reprinted from the Edition of 1672*, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 *The Public Records of the Colony of Connecticut* 191 (1890) (1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"). And in 1795, Pennsylvania adopted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* 240-44 (1810).

In like fashion, states historically enacted licensing regimes for firearms. Both Massachusetts and Maine prohibited the sale of any musket or pistol unless it was approved,

marked, and stamped by a government official. *See* 1814 Mass. Acts 464 Ch. 192, Section 2; § 1821 Laws of the State of Maine 685-86, Vol. 2, section 3. New Hampshire created a state gunpowder inspection regime to examine manufacturing and storage sites. Act of June 21, 1820, ch. XXV, 1820 N.H. Laws 274, 274-76. And New Jersey required all gun powder manufacturers to obtain a license. 1811 N.J. Laws 300, An Act to Regulate Gun Powder Manufactories and Magazines Within this State, Section 1.

**2.** The challenged regime here is of a piece with that tradition. In enacting the Omnibus Crime Control Act of 1968 and the Gun Control Act of 1968, Congress sought to address concerns about public safety and that individuals deemed dangerous were evading state laws designed to ensure only law-abiding citizens could acquire firearms. *See Holton*, 639 F. Supp. 3d at 711-12 (citing *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010)), Congress was specifically concerned that "the existing Federal controls over [widespread traffic in arms did] not adequately enable the States to control this traffic within their own borders through the exercise of their police power." Crime Control Act § 901(a)(1), 82 Stat. at 225 (1968). Congress concluded that there was a problem of individuals crossing state lines to procure firearms they could not lawfully obtain in their own state without the knowledge of local authorities and that many of these individuals were criminals and juveniles.[5] *Mance v. Sessions*, 896 F.3d 699, 706 (5th Cir. 2018) (citing Crime

---

[5] This continues to be a serious problem in the United States, particularly with respect to gangs and felons. From 2017 to 2023, 28% (more than 600,000) of crime guns traced to a purchaser were recovered in a state different from where it was purchased. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), National Firearms Commerce and Trafficking Assessment (NFTCA), Vol. IV, Part III, at 10. Of those, approximately 70% were pistols. *Id*. at 2. Firearms trafficking poses a particular safety issue because it is a reliable source of firearms for gangs and cartels in the United States. In firearms trafficking investigations from 2017 through 2021 where at least one trafficker was identified, 27% of traffickers had prior felony convictions and 17% were known gang members. *Id*., Part IV, at 4-5. During that same period, in 59.6% of all investigations the end user was a convicted felon and in 29.1% of cases the end user was a known gang member or associate. ATF, NFCTA, Vol. III, Part VI, at 13. Another 22.1% of end-

13

Control Act § 901(a)(1), 82 Stat. at 225 (1968)). To prevent individuals, many of whom were criminals or juveniles, from evading the laws of their own state, Congress funneled individuals' handgun purchases through FFLs in their home state. *Id*. at 706-08. Because FFLs are required to determine that the purchaser is eligible to acquire and possess the handgun they seek to acquire in their state of residence, 18 U.S.C. § 922(b)(2), Congress determined that it was reasonable to expect FFLs to master their state and local laws. *Mance*, 896 F.3d at 708. But what is not reasonable, and is not even realistic, is for an FFL to master the state and local laws of the 49 other states, plus the District of Columbia. *Mance*, 896 F.3d at 707-708.[6] In keeping with our regulatory tradition, then, the challenged laws at issue here are commercial firearms regulations aimed at ensuring that only law-abiding citizens may acquire firearms.

The burdens the scheme imposes, moreover, are modest and carefully tailored. As the Fifth Circuit observed when it previously addressed the commercial regulations at issue here, "[t]he challenged federal gun laws allow ample access to handguns by those who are permitted to possess and purchase them under state and local laws." *Mance*, 896 F.3d at 709.[7]

---

users were drug traffickers. *Id*. This is of particular concern to Texas, which was a top ten market state for trafficked firearms for 2017-2021. ATF, NFTCA, Vol. III, Part IV, at 9-11.

[6] Plaintiffs suggest that there are other ways to more effectively address this concern. Compl. ⁋17. While Plaintiffs may disagree with the policy chosen by Congress, the place to address that concern is in the halls of Congress, not in the courts. *See Lujan v. National Wildlife Fed.*, 497 U.S. 871, 891 (1990).

[7] As noted above, *Mance* was a challenge to the same regulatory regime. Because *Mance* was decided on the means-end analysis abrogated in *Bruen*, that analysis does not govern this case. *See Reese v. ATF*, 127 F.4th 583, 586 (5th Cir. 2025) (finding prior Circuit precedent upholding restrictions on selling handguns to eighteen-to-twenty-year-olds "is incompatible with the *Bruen* and *Rahimi* decisions of the Supreme Court" and analyzing laws under *Bruen* framework). But the observations made by the Fifth Circuit regarding the nature of the burden of the challenged laws and the purpose of the laws remains undisturbed by *Bruen* and is relevant to this Court's analysis.

Those modest burdens are the product of a regime crafted to address the problem at hand. When it passed the Federal Firearms Act in 1938, Congress had tried a licensing system that permitted interstate sales. But that system resulted in rampant evasion of state law. Congress, thus, acted reasonably when it tightened the restrictions on interstate sales in 1968. A minimal, tailored burden on the right to acquire arms does not infringe the right. *See McRorey*, 99 F.4th at 839; *see also Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 227 (4th Cir. 2024) (en banc) (observing that in *Bruen* the Supreme Court sanctioned some delay by concluding that background checks and training requirements will ordinarily pass constitutional muster without a historical inquiry); *Ortega v. Lujan-Grisham*, 741 F. Supp. 3d 1027, 1076-85 (D. N.M. 2024) (challenge to New Mexico's waiting period act does not implicate the Second Amendment).

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed.

Dated: June 9, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

*/s/ Andrew I. Warden*
ANDREW I. WARDEN
Assistant Branch Director
Indiana Bar No. 23840-49
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, D.C. 20005
Phone: 202-616-5084
Email: Andrew.Warden@usdoj.gov

*Counsel for Defendants*

15