UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

---

ELITE PRECISION CUSTOMS LLC, *et al.*,

*Plaintiffs*,

v.

THE BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

*Defendants*.

No. 4:25-cv-00044-P

---

**BRIEF OF PLAINTIFFS IN SUPPORT OF
SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 1

   I.   The Nonresident Handgun Purchase Ban ........................................ 1

   II.   The Ban's Effect on Plaintiffs ........................................................... 3

   III.   Procedural History ............................................................................. 5

ARGUMENT ....................................................................................................... 6

   I.   Standard of Review ............................................................................ 6

   II.   The Nonresident Handgun Purchase Ban Violates the Second Amendment. . 8

      A.   The Right to Keep and Bear Arms Encompasses the Right to Purchase Them. ............................................................................ 8

      B.   The Nonresident Handgun Purchase Ban Lacks Any Historical Support. ........................................................................................ 13

CONCLUSION .................................................................................................. 27

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                          **<u>Page(s)</u>**

*Boynton v. Kusper,*
    494 N.E.2d 135 (Ill. Sup. Ct. 1986) ................................................................. 13

*Carey v. Population Servs., Int'l,*
    431 U.S. 678 (1977) ............................................................................................ 13

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010) ......................................................................................... 7, 8

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015) ............................................................................................. 6

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................... 6, 7, 10, 13, 22

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ............................................................................. 6

*Gibbons v. Ogden,*
    22 U.S. (9 Wheat.) 1 (1824) ............................................................................ 23

*Grosjean v. Am. Press Co.,*
    297 U.S. 233 (1936) .......................................................................................... 13

*Harper v. Va. State Bd. of Elections,*
    383 U.S. 663 (1966) .......................................................................................... 13

*Hughes v. Oklahoma,*
    441 U.S. 322 (1979) .......................................................................................... 23

*In re Trade-Mark Cases,*
    100 U.S. 82 (1879) .............................................................................................. 7

*Mance v. Holder,*
    74 F. Supp. 3d 795 (N.D. Tex. 2015) ...................................................... 2, 3, 12

*Mance v. Sessions,*
    896 F.3d 699 (5th Cir. 2018) ............................................................................. 2

*McRorey v. Garland,*
    99 F.4th 831 (5th Cir. 2024) ..................................................................... 10, 11

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ..............................................7, 8, 10, 12, 13, 14, 19, 22, 23

*Nguyen v. Bonta,*
    No. 24-2036, 2025 WL 1718079 (9th Cir. June 20, 2025) ............................. 27

*People v. Burns,*
    79 N.E.3d 159 (Ill. Sup. Ct. 2015) .................................................................... 7

*Reese v. ATF,*
    127 F.4th 583 (5th Cir. 2025) ...................................................... 8, 9, 11, 13, 14

*Test Masters Educ. Servs., Inc. v. Singh,*
    428 F.3d 559 (5th Cir. 2005) ........................................................................... 6

*United States v. Reese,*
    92 U.S. 214 (1875) ............................................................................................ 7

*Yukutake v. Lopez,*
    130 F.4th 1077 (9th Cir. 2025) ................................................................... 8, 9

## Statutes and Constitutional Provisions

18 U.S.C.
    § 922(a)(3) ............................................................................................... 2, 12
    § 922(b) ........................................................................................................ 12
    § 922(b)(3) ...................................................................................................... 2
    § 922(g)(1) ...................................................................................................... 2
    § 922(t) ....................................................................................................... 2, 3

27 C.F.R. § 478.99(a) .......................................................................................... 2

28 C.F.R.
    § 25.1 .......................................................................................................... 2, 3
    § 25.2 .......................................................................................................... 2, 3
    § 25.6(d) ...................................................................................................... 2, 3

Fed. R. Civ. P. 56(a) ........................................................................................... 6

U.S. CONST. amend. II .................................................................................... 1, 8

## Other Authorities

1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828),
    https://perma.cc/6JBC-N5BB ..................................................................... 9, 10

11 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT (Charles J. Hoadly ed.,
    1890), https://perma.cc/3QWS-ZPJA .............................................................. 19

*A Dictionary of the English Language: A Digital Edition of the 1773 Classic By
    Samuel Johnson,* https://perma.cc/U2YG-2EX3 ................................................. 9

Act of Apr. 18, 1795, *in* 3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA (1810),
    https://perma.cc/SD65-EBN6 ......................................................................... 16

Act of Feb. 12, 1719, *in* 3 THE STATUTES AT LARGE OF SOUTH CAROLINA (Thomas
    Cooper ed., 1838), https://perma.cc/83KF-YNBZ ............................................ 20

Act of Feb. 28, 1814, ch. 192, § 2, *in* 6 LAWS OF THE COMMONWEALTH OF
    MASSACHUSETTS (1812–15), https://perma.cc/6V4Q-YN2S ...................... 17, 18

Act of Feb. 7, 1811, 1811 N.J. Laws 300, § 1, *in* LAWS OF THE STATE OF NEW-JERSEY
    (1821), https://perma.cc/3N3H-U38U .............................................................. 17

Act of June 21, 1820, ch. 24, § 2, *in* 8 LAWS OF NEW HAMPSHIRE (1920), https://perma.cc/LHC5-AATL ........................................................................ 17

Act of Mar. 10, 1821, ch. 162, § 3, *in* 2 LAWS OF THE STATE OF MAINE (Francis O. Smith ed., 1834), https://perma.cc/T9BN-XRXE ............................................... 17

COLONIAL LAWS OF MASSACHUSETTS (1887), https://perma.cc/8JYU-46MH ............. 18

2 WILLIAM WALTER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619 (1823), https://perma.cc/9QB8-QW4Y ..................................... 25, 26

LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (E.B. O'Callaghan ed., 1868), https://perma.cc/9SYQ-QG8H ........................................................ 26, 27

PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND (1836), https://perma.cc/4AEL-NB5A .................................................................... 20, 21

Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://perma.cc/F98Y-3D32 ................................................................... 13, 14

Edward St. Germain, *Bacon's Rebellion of 1676*, AMERICANREVOLUTION.ORG, https://perma.cc/5NDF-DLWG ........................................................................ 26

THE FEDERALIST NO. 11 (Jacob E. Cooke ed., 1961) (Alexander Hamilton) ............. 23

THE FEDERALIST NO. 42 (Jacob E. Cooke ed., 1961) (James Madison) ..................... 23

The First Code of Laws, May 1650, *in* TRUE-BLUE LAWS OF CONNECTICUT AND NEW HAVEN AND THE FALSE BLUE-LAWS INVESTED BY THE REV. SAMUEL PETERS (J. Hammond Trumbull ed., 1876), https://perma.cc/H4QJ-BXY8 ............... 24, 25

1 J. HAMMOND TRUMBULL, PUBLIC RECORDS OF THE COLONY OF CONNECTICUT (1850), https://perma.cc/2G7H-QSD3 .................................................................. 14, 24

Virginia Act of Feb. 27, 1631, *in* 1 WILLIAM WALLER HENING, STATUTES AT LARGE (1823), https://perma.cc/M4YT-BXQA ....................................................... 14, 21

WAVERLY K. WINFREE, BEING A SUPPLEMENT TO HENING'S THE STATUTE'S AT LARGE (1971) ........................................................................................................... 19, 20

**INTRODUCTION**

The Second Amendment to the United States Constitution protects the "right of the people to keep and bear Arms." U.S. Const. amend. II. As the Government freely admits, the laws at issue in this case, which bar the transfer of a handgun from a licensed dealer to a law-abiding and peaceable citizen of any of the 49 states where the dealer is not located, "unquestionably burden[] [that] fundamental right." Defs.' Br. in Supp. of Mot. to Dismiss, Doc. 38 at 1 (June 9, 2025) ("MTD"). The issue for this Court to resolve is simply whether the Government's ban is historically justifiable, and it is not. Despite throwing at the wall a wide variety of regulations and restrictions on the right that existed between the early 17th century and the early 19th, the Government does not cite a *single* law that burdened the right of peaceable citizens to acquire arms in another state or colony in any way like the laws at issue here, or for anything approaching the same reasons.

That is fatal to the Government's case; though it repeatedly stresses in its brief that the law at issue enacts, in its view, only a minor limitation on the right, the Supreme Court has foreclosed exactly that type of argument. Only history can excuse the Government's regulation of the right to acquire handguns from licensed dealers, and history does no such thing.

**BACKGROUND**

**I.    The Nonresident Handgun Purchase Ban**

The federal laws at issue in this case make it impossible for a peaceable American, who is not prohibited for any reason from possessing firearms, to purchase a handgun from a federally licensed firearms dealer unless that dealer is located in

1

his home state. First, federal law "forbid[s] individuals from transporting into or receiving in their state of residency any firearm acquired outside of that state, except for firearms acquired by bequest or intestate succession." *Mance v. Holder*, 74 F. Supp. 3d 795, 799 (N.D. Tex. 2015) (discussing 18 U.S.C. §§ 922(a)(3), (5)), *rev'd sub nom*, *Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) (applying pre-*Bruen* interest balancing to reject a Second Amendment challenge to the law). Backing up these consumer-focused provisions, retailers are barred from selling or delivering handguns "to any person who the [dealer] knows or has reasonable cause to believe" resides in another state. 18 U.S.C. § 922(b)(3); *see also* 27 C.F.R. § 478.99(a) (requiring that a federally licensed dealer "shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in … the State in which the licensee's place of business or activity is located"). The restrictions do not apply to shotguns or rifles, and they do not prevent transfers from licensed dealers in one state to dealers in another state. 18 U.S.C. § 922(b)(3).

These requirements, collectively the "Nonresident Handgun Purchase Ban" or "the Ban," are distinct from the many other restrictions Congress has placed on the transfer of handguns, including bans on purchase of handguns by certain disqualified individuals, *see, e.g.*, *id.* § 922(g)(1) (banning purchase of firearms by felons), or the requirement that licensed dealers must run a background check on any potential purchaser to ensure that he is legally eligible to possess firearms and ammunition

and not part of any category of disqualified individuals, *see id.* § 922(t); 28 C.F.R. §§ 25.1-.2, 25.6(d).

The upshot of these restrictions is that a peaceable American who is not disqualified from owning firearms is nevertheless proscribed from purchasing a handgun unless he is in the state where he resides and, when traveling within the country, can only purchase a handgun from a dealer in another state if he is able to arrange and pay for the out-of-state retailer to ship the handgun to a licensed in-state retailer that can, finally, complete the sale. But this effectively gives in-state dealers a veto on the ability of residents of their state to take their business to another state and buy firearms from competitors elsewhere. Unsurprisingly, this manifests functionally as both a logistical and a monetary tax on the right to keep and bear arms, as not all retailers will agree to perform interstate transfer services, and those that do typically charge a significant fee for the privilege. *See Mance*, 74 F. Supp. 3d at 807 ("To obtain a handgun from an out-of-state FFL retailer, the federal interstate handgun transfer ban imposes substantial additional time and expense to those who desire to purchase one."). And of course, an individual who wishes to acquire and take possession of a handgun while away from his home state simply has no way to do so.

## II. The Ban's Effect on Plaintiffs

The Plaintiffs in this case are one federally licensed firearms dealer, Elite Precision Customs LLC, located in Mansfield, Texas, two individuals, Tim Herron and Freddie Blish, residents of New Mexico and Arizona respectively, and one organization, Firearms Policy Coalition, a nonprofit membership organization that

3

counts Elite Precision Customs, Herron, and Blish among its members across the country who are adversely affected by the Ban.

Elite Precision Customs is a federally licensed dealer and gunsmith located in Texas. App.1. Texas does not independently bar Elite Precision from selling handguns to out-of-state purchasers and Elite Precision would, if not for the Ban, and in compliance with all other federal and state laws regulating the transfer of firearms, sell handguns to individuals who reside in states other than Texas. App.2. Two of those individuals are Herron and Blish. Herron is a competitive shooter and firearms trainer who teaches firearms classes across the country. App.7. He travels frequently all over the country to conduct these trainings, and he regularly teaches at ranges that double as licensed firearms dealers. App.7. He has, many times in the past, found a handgun while on the road that he would have purchased, were it not for the Ban. App.7–8. Indeed, he has on occasion chosen to purchase a handgun even though he is traveling, and routed the transaction through a dealer located in Albuquerque, New Mexico, but in doing so he has experienced delays in acquiring the firearm and incurred an additional cost of $30-40 dollars to pay for the local dealer's "service" in facilitating the transaction. App.8. Herron teaches classes in Texas, and he would, if not for the Ban, purchase a handgun from Elite Precision in Texas. App.7–8.

Blish is also a firearms instructor who teaches classes in handgun self-defense in many states around the country, including in Texas. App.3. When traveling for work, Blish frequently shops for firearms and he would, if not for the Ban, occasionally purchase a handgun directly from an out-of-state dealer. App.3–4. Blish

has never done so, however, because the Ban has prevented him from acquiring a firearm in this way. App.3–4. Were it not for the ban, Blish would acquire a handgun directly from Elite Precision. App.4.

FPC is a membership organization that seeks to create a world of maximal human liberty and freedom, including by defending and advancing the inalienable, fundamental, and individual right to keep and bear arms. App.5. It has members across the country, including Blish and Herron, who are peaceable, responsible citizens who desire to and do purchase handguns for lawful purposes including self-defense. App.5. These members, including Blish and Herron, would, if not for the Ban, occasionally acquire handguns from dealers located outside of their home states, and without incurring the delays and costs entailed by the Ban. App.6. Others of FPC's members, like Elite Precision, would *sell* firearms to such individuals, but for the Ban. App.6. FPC brings this suit on behalf of its members. App.6.

### III.  Procedural History

On January 20, 2025, Plaintiffs filed this case, alleging that the Ban violates their rights, and FPC's members' rights, to acquire handguns under the Second Amendment to the Constitution. Compl., Doc. 1 (Jan. 20, 2025). Given the purely legal nature of the issues raised by Plaintiffs' challenge, the parties agreed to forego discovery and to resolve this case through dispositive motions and the Court ordered that the parties should file cross-dispositive motions. Order, Doc. 32 (Apr. 28, 2025). The Government filed a motion to dismiss, *see* Defs.' Mot. to Dismiss, Doc. 37 (June

9, 2025), and Plaintiffs now oppose that motion and cross-move for summary judgment in their favor.

## ARGUMENT

### I.    Standard of Review

In evaluating Plaintiffs' cross-motion for summary judgment and opposition to the Government's motion to dismiss, summary judgment is appropriate if, when viewing all evidence in favor of the non-moving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The government's cross motion to dismiss should be denied unless there are no set of facts that would entitle Plaintiffs to relief. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).

The government emphasizes that Plaintiffs have challenged the Ban on its face, "the most difficult challenge to mount successfully." MTD at 8 (quoting *United States v. Rahimi*, 602 U.S. 680, 694 (2024)). But "the [Supreme] Court has allowed such challenges to proceed under a diverse array of constitutional provisions," including the Second Amendment. *See City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (citing, among other cases, *District of Columbia v. Heller*, 554 U.S. 570 (2008)). And in conducting a facial constitutional analysis, the Court simply compares the terms of the statute to the governing constitutional test. *See Ezell v. City of Chicago*, 651 F.3d 684, 698–99 (7th Cir. 2011). Here, that means asking whether barring handgun sales to nonresidents is justified by this Nation's historical tradition of firearm regulation. If the answer to that question is no, the Nonresident Handgun Purchase Ban is facially unconstitutional. It does not matter whether the government

could have enacted a law barring some subset of interstate handgun transactions—for example, sales to violent felons. That would not be a valid application of *this* statute. *See, e.g.*, *In re Trade-Mark Cases*, 100 U.S. 82, 98 (1879) ("[I]t is not within the judicial province to give to the words used by Congress a narrower meaning than they are manifestly intended to bear in order that crimes may be punished which are not described in language that brings them within the constitutional power of that body."); *United States v. Reese*, 92 U.S. 214, 221 (1875) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."); *People v. Burns*, 79 N.E.3d 159, 165–66 (Ill. Sup. Ct. 2015) ("An unconstitutional statute does not 'become constitutional' simply because it is applied to a particular category of persons who could have been regulated, had the legislature seen fit to do so."). Accordingly, in *Heller*, the Supreme Court struck down the District of Columbia's handgun ban on its face, even while positing that some subset of handguns (automatic ones) potentially could be banned consistent with the Second Amendment. *See Heller*, 554 U.S. at 624. And the Supreme Court in *Bruen* facially struck down New York's may-issue carry law, even while positing that carry potentially could be banned altogether in some subset of particularly sensitive public locations. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30–31 (2022).

In any event, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the

pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "The distinction" rather "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id*. And here, Plaintiffs have not in any way limited themselves to a facial challenge. So, if for some reason the Court were to determine that a facial remedy would be inappropriate, Plaintiffs would still be entitled to as-applied relief.

## I. The Nonresident Handgun Purchase Ban Violates the Second Amendment.

The Supreme Court has explained that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The government concedes that the act of purchasing firearms is necessarily encompassed by the right to "keep" and to "bear" them, but it nevertheless claims that the Ban can be historically justified. It is wrong.

### A. The Right to Keep and Bear Arms Encompasses the Right to Purchase Them.

The Second Amendment's plain text reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Government acknowledges that "purchasing arms … is a fundamental incident of" the right to keep and bear arms, "and thus, [falls] within the scope of conduct protected by the Second Amendment." MTD at 8. Indeed, the Fifth Circuit has already held that "the right to 'keep and bear

arms' surely implies the right to purchase them." *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025); *see also Yukutake v. Lopez*, 130 F.4th 1077, 1091 (9th Cir. 2025).

Despite its apparent concession, the Government nevertheless glancingly makes arguments that could be construed as textual when it suggests that the burden on the right created by the Ban, which it claims is "modest and carefully tailored" or "minimal [and] tailored," *see* MTD at 14–15, is so insignificant that the cannot be said to "infringe the right," *id.* at 15. But the determination whether a law infringes the right to keep and bear arms is not made by analyzing the extent to which a law is "modest and carefully tailored," but rather by applying *Bruen*'s text-then-history analysis. At the plain-text stage, the question is whether acquiring a firearm outside of a person's state of residence implicates the plain text of the Second Amendment, and the Government concedes that it does. That means that the Ban *presumptively* infringes the Second Amendment, and it is incumbent upon the Government to rebut that presumption by demonstrating that the law is consistent with this Nation's history of firearm regulation. If the Government cannot rebut that presumption, then the Ban *conclusively* infringes the Second Amendment. After all, at the Founding, to infringe simply meant to violate. *See A Dictionary of the English Language: A Digital Edition of the 1773 Classic By Samuel Johnson,* https://perma.cc/U2YG-2EX3 (defining "infringe" as "1. To violate; to break laws or contracts."); 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://perma.cc/6JBC-N5BB ("1. To break, as contracts; to violate, either positively by contravention, or negatively by non-fulfillment or neglect of performance. A prince or a private person

infringes an agreement or covenant by neglecting to perform its conditions, as well as by doing what is stipulated not to be done."). And in conducting this analysis, concepts such as tailoring are out of bounds. Indeed, in *Bruen* the Supreme Court expressly instructed that courts may not "engage in independent means-end scrutiny" in the guise of applying *Bruen*'s analysis. 597 U.S. at 29 n.7.

The Government makes a second possibly textual argument when it characterizes the Ban as a mere " 'condition[ ] or qualification[ ] on the commercial sale of arms' " that is, therefore, "presumptively constitutional." MTD at 9 (quoting *Heller*, 554 U.S. at 626–27). The Government relies on *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), which dealt with the constitutionality of a background check requirement on the sale of firearms to 18-to-20-year-olds. The court treated *that* requirement as a "condition[ ] or qualification[ ]" on the sale of arms that did not violate the Second Amendment, relying heavily on *Bruen*'s suggestion that non-abusive background check requirements generally are permissible. *See id.* at 836–37 (quoting *Heller*, 554 U.S. at 626–27).

But *McRorey* does not hold that *all* sales restrictions evade Second Amendment scrutiny. To the contrary, the court made clear that "the right to 'keep and bear' *can* implicate the right to purchase." *Id.* at 838 (emphasis added). Indeed, any conclusion to the contrary would allow governments to "shoehorn[ ] restrictions on purchase into functional prohibitions on keeping." *Id.* The Fifth Circuit concluded that this is not what the Government was doing in *McRorey* because it read *Bruen* as denying any right to come into possession of a firearm without submitting to a background check.

10

The question in this case, then, is whether the Second Amendment allows the Government to deny an individual the right to come into possession of a handgun outside of the state of his residence. Because the answer to that question is no, the Nonresident Handgun Purchase Ban *does* seek to "shoehorn" a restriction on the purchase of firearms into an infringement of the right to keep and bear arms.

This reading of *McRorey* is confirmed by the Fifth Circuit's later decision in *Reese*, stating that "a purchase ban unknown at the time of the founding can[not] evade *Bruen* analysis." *Reese*, 127 F.4th at 590 n.2. *Reese* therefore confirms that, consistent with *McRorey*, determining whether a putative "sales restriction" is in fact an unconstitutional infringement of the right to keep and bear arms requires doing the "*Bruen* analysis." *Id.* In *McRorey*, that exercise was not necessary because, in the Fifth Circuit's estimation, "*Bruen*'s footnote 9 [addressing shall-issue permitting regimes and background checks] plainly foreclose[d] plaintiffs' contention." 99 F.4th at 837. In *Reese*, however, where the question of whether a restriction on 18-to-20-year-olds had not been addressed by the Court, the Fifth Circuit had to conduct its own historical analysis. So too here—nothing in *Bruen* or *Heller* resolves the question of whether there exists a historical tradition of limiting citizens to acquiring handguns only in their state of residence. As discussed below there is no such tradition.

Finally, even if this Court concluded that determining whether the Ban falls within the plain text of the Second Amendment under *McRorey* and *Reese* requires deciding whether the law is a severe enough restriction on sales that it necessarily to

11

implicates the right to "keep" or to "bear" firearms, the Ban would still qualify for constitutional scrutiny. The Government repeatedly claims that the Ban does not and, at most, imposes a few days delay in acquiring one, akin to the wait for a background check to be completed. *See, e.g.*, MTD at 10 ("The challenged regime … modestly delay[s] the time an individual who purchases a handgun while out-of-state may take delivery of a handgun."). But that dramatically understates what the Ban does. As this Court explained pre-*Bruen*, these restrictions are, in fact a "federal interstate handgun transfer ban" that bars any citizen anywhere from "acquiring a handgun directly from a federal firearms licensee in another state." *Mance*, 74 F. Supp. 3d at 799 n.2. The Government's argument places a lot of weight on the *exception* to the Ban that allows interstate transfers if the buyer "arrang[es] for the handgun to be delivered to an in-state [firearms dealer], from whom the purchaser may retrieve the handgun." MTD at 6; *see also* 18 U.S.C. § 922(a)(3), (b). But that exception cannot save the broader Ban, for its only real effect is to give in-state dealers an absolute veto on competition from out of state and effectively to require an individual seeking to buy a firearm from an out-of-state dealer to pay a premium for the privilege.

And lest the Government make light of the $40 cost on the interstate transfer of firearms as "modest," as the Supreme Court has made clear, the Second Amendment does not protect "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality op.)). And in the

context of any other constitutional right, even a small cost would undoubtedly be treated as triggering constitutional scrutiny, given the obvious fact that the imposition of a cost has a "direct tendency" to restrict the exercise of the right. *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244–45 (1936); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966) (striking down poll tax of $1.50); *Boynton v. Kusper*, 494 N.E.2d 135, 141 (Ill. Sup. Ct. 1986) (striking down $10 tax on marriage licenses); *cf. Carey v. Population Servs., Int'l*, 431 U.S. 678, 687, 689 (1977) (striking down a state law limiting sale of contraceptives to licensed pharmacists because "[r]estrictions on the distribution of contraceptives" both lessened consumer choice in where to purchase and "lessens the possibility of price competition"). Indeed, the fact that the Ban specifically singles out handguns, "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629, for this unusual restriction makes the claim that the Ban is so modest as to escape all constitutional scrutiny particularly untenable.

### B. The Nonresident Handgun Purchase Ban Lacks Any Historical Support.

Given that the Ban bars purchases of handguns, and therefore implicates the plain text of the Second Amendment, the question then becomes whether the Government carry its burden by showing that the Ban is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. " 'Why and how the regulation burdens the right are central to this inquiry' in 'considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.' " *Reese*, 127 F.4th at 588 (quoting *Rahimi*, 602 U.S. at 692). In conducting this analysis, the focus must be on Founding-era limitations on the right. Mark W.

13

Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, Harv. J. L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://perma.cc/F98Y-3D32. While later laws may confirm or clarify the scope of a Founding-era tradition, "proceeding past the bounds of founding-era analogues … is risky under *Bruen*." *Reese*, 127 F.4th at 599; *see also id.* at 588 ("A law may unconstitutionally infringe on the right when it goes 'beyond what was done at the founding,' 'even when it regulates arms-bearing for a permissible reason.") (quoting *Rahimi*, 602 U.S. at 692) (cleaned up). In this case, the issue of the value of *later* laws is largely academic, since the Government relies on laws that extend, at the latest, to 1820. But it does rely on several early colonial laws from the 17th century, some of which predate the ratification of the Second Amendment by 150 years. *See, e.g.*, Virginia Act of Feb. 27, 1631, *in* 1 William Waller Hening, Statutes at Large 174–75 (1823), https://perma.cc/M4YT-BXQA (1631 law); 1 J. Hammond Trumbull, Public Records of the Colony of Connecticut 138–39 (1850), https://perma.cc/2G7H-QSD3 (1642 law). And these laws are at least as shaky a basis to rest *Bruen*'s historical analysis on as are laws that come too late. *See Bruen*, 597 U.S. at 34 ("Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.").

Keeping those principles in mind, the Government has failed to offer an adequate historical justification for the Ban. The historical pitch is that at some points prior to the Founding, laws "entirely foreclosed commercial transactions with out-of-state individuals and others," and that "[s]ince the time of the Founding, states

14

have regulated how firearms and gunpowder can be traded and transported, particularly across state lines." MTD at 10–11. These historical principles, the Government claims, are the same that undergird the Ban because both the historical laws and the modern Ban sought "to ensure only law-abiding citizens acquire firearms," including by "foreclos[ing] commercial transactions with out-of-state individuals and others." *Id.* at 10. Indeed, the government claims that the Ban exacts a lighter burden on the right than several of its historical analogues, because it only "modestly delay[s] the time an individual who purchases a handgun out-of-state may take delivery of a handgun." *Id.* Plaintiffs do not take issue with the Government's claim that it can keep certain categories of prohibited persons from acquiring firearms, but they disagree that the Ban is an acceptable way of promoting that goal. As noted above, the Government's justification for the Ban requires misunderstanding how severe the Ban actually is, and it is precisely the sort of interest-balancing reasoning that the Supreme Court has forbidden. The question, for this Court, is whether these historical laws evidence a principle that residents of one state can be barred from purchasing a firearm in another state to advance the goal of keeping prohibited persons from acquiring handguns. They do not.

The Government greatly overstates the level of historical support it has for its argument. To begin with, several of the Government's laws can be rejected out of hand as having nothing to do with restricting the transfer of firearms across state boundaries at all and having been motivated by concerns entirely distinct from the Government's purported goal of ensuring that prohibited persons not acquire arms.

15

*Proving laws and manufacturing restrictions.* Take, for instance, the several gunpowder or firearm proving laws the Government cites for the basic proposition that forms of commercial regulation existed at the Founding. None of these laws are at all relevant to the present dispute, as not one stopped citizens of one state from acquiring firearms or gunpowder in another, or even restricted interstate commerce at all. Start with the Government's 1795 Pennsylvania law that prohibited anyone from importing gunpowder for sale into Pennsylvania without subjecting it first to inspection and marking. *See* Act of Apr. 18, 1795, *in* 3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA 240–44 (1810), https://perma.cc/SD65-EBN6. The law, which was aimed at preventing the importation of gunpowder "of inferior qualities" with "defects [that are] not discovered until brought into actual use[,]" did not prevent *anyone* from bringing gunpowder in from another state, even for sale, and it only applied its proving requirement to large quantities. *Id.* at 240. It therefore exacted an entirely different *type* of burden on the right to keep and bear arms (if indeed requiring that gunpowder be functional can be called a burden at all). And it did so for obviously different reasons. It was concerned not with keeping individuals who should not possess firearms or gunpowder from acquiring it (as the Government claims the Ban does with handguns) but with ensuring that gunpowder that was offered for sale within Pennsylvania was of adequate quality.

The government cites two other gunpowder laws that are similarly irrelevant. An 1820 New Hampshire law, it claims, "created a state gunpowder inspection regime to examine manufacturing and storage sites" and an 1811 New Jersey law "required

all gun powder manufacturers to obtain a license." MTD at 13. It is apparent even from these descriptions that the laws are unrelated to the Ban—neither restricted interstate commerce in the slightest. As with the Pennsylvania law, the New Hampshire law was merely a quality control statute designed to prevent the sale or use of defective powder. *See, e.g.*, Act of June 21, 1820, ch. 24, § 2, *in* 8 LAWS OF NEW HAMPSHIRE 908 (1920), https://perma.cc/LHC5-AATL (prescribing proportions of ingredients for production of acceptable gunpowder). As long as the proving and manufacturing restrictions were met, it imposed no jurisdictional restrictions on the sale or export of powder. And the Government misstates the New Jersey law, which did not require anyone to obtain a license to manufacture gunpower; it merely restricted, as a fire-prevention measure, the places where new gunpowder factories could be built. *See* Act of Feb. 7, 1811, 1811 N.J. Laws 300, § 1, *in* LAWS OF THE STATE OF NEW-JERSEY 549 (1821), https://perma.cc/3N3H-U38U.

Finally, the Government cites an 1814 Massachusetts law that "prohibited the sale of any musket or pistol unless it was approved, marked, and stamped by a government official" and an 1821 Maine law that did the same. MTD at 12–13. But again, neither law particularly restricted sales to nonresidents or purchases by their residents of firearms that were made out of state. Both were focused on regulating anyone selling new firearms "within this State," Act of Mar. 10, 1821, ch. 162, § 3, *in* 2 LAWS OF THE STATE OF MAINE 802 (Francis O. Smith ed., 1834), https://perma.cc/T9BN-XRXE; *see also* Act of Feb. 28, 1814, ch. 192, § 2, *in* 6 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 464–65 (1812–15), https://perma.cc/6V4Q-

YN2S (prohibiting manufacturing "within this Commonwealth" or selling or purchasing an unproven musket or pistol), and then only prohibited the sale if the firearms were not first "proved" to make sure they did not have latent defects in their barrels. Again, these laws were effectively precursors to consumer protection statutes and are nothing like the Ban.

*Public defense restrictions.* The Government's remaining laws, which it groups together as "direct or indirect prohibitions on the sale of firearms to individuals not from the jurisdiction" or laws that similarly "prohibited the export of gunpowder without a license," are much more of a grab-bag than the Government's homogenizing description admits. MTD at 11–12. Take first the two laws that the Government indicates prohibited export of gunpowder without a license. One, from Massachusetts in 1651, did not operate at all like the Ban. Rather, it was essentially aimed at preventing embezzlement of *public* stores of gunpowder. As the statute itself explains, it was concerned with preserving the powder and ammunition "imported into this jurisdiction for our necessary use and defence" every year "by favour of the Government in England" and it therefore required individuals who were bringing powder or ammunition into the colony to give notice of the quantity imported to the public notary, who could permit the individual to export only the same quantity of powder he had brought into the colony, ensuring that the public stores would not be depleted. COLONIAL LAWS OF MASSACHUSETTS 125–26 (1887), https://perma.cc/8JYU-46MH.

18

The other, a 1775 Connecticut statute, is similarly inapposite. Passed early in the American Revolution, the statute evidences an overwhelming concern with ensuring that Connecticut and her citizens would have enough powder to carry out the war. In addition to forbidding anyone from exporting powder without a license from the General Assembly, the statute subsidized the manufacture of powder within the colony and further required any town where powder was not manufactured to create a powder factory "at the expence and for the benefit of said town." 11 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 190–91 (Charles J. Hoadly ed., 1890), https://perma.cc/3QWS-ZPJA (entitled "An Act for encouraging the Manufactures of Salt Petre and Gun Powder"). As a wartime measure, this law has little weight in determining the scope of the Second Amendment right. *See Bruen*, 597 U.S. at 63 n.26.

Some of the Government's firearm laws were notably similar. For instance, the Government claims that a 1720 Virginia statute "restricted residents of the counties of Spotsylvania and Brunswick from transporting firearms outside the county" and a 1719 South Carolina law "completely banned the export of all firearms, including through sale." MTD at 11–12. But in both cases, the laws only restricted the sale or export of arms *owned* by the county or by the state and did not in any way restrict the *private* import or export of firearms. The 1720 Virginia law allocated £1,000 for the purchase of firearms for the defense of the newly established counties and permitted any person in the county who needed one for defense to use a county-owned firearm for that purpose, but it restricted those persons from removing them outside

of the county. WAVERLY K. WINFREE, BEING A SUPPLEMENT TO HENING'S THE STATUTE'S AT LARGE 181–82 (1971). The 1719 South Carolina law likewise began by noting that the English government had sent it "a good quantity of arms" and that the colony had itself "been at great expences to buy and procure great quantities of arms" for its defense. Act of Feb. 12, 1719, *in* 3 THE STATUTES AT LARGE OF SOUTH CAROLINA 100–01 (Thomas Cooper ed., 1838), https://perma.cc/83KF-YNBZ. It was these publicly owned arms, specifically, that citizens were barred from selling or loaning outside of the colony. *Id.* at 101. Just as with the 1651 Massachusetts gunpowder law, these laws are unlike the Ban because they did not apply to ordinary selling or buying of privately owned firearms but were, effectively, laws aimed at securing *public* defense equipment.

The 1776 Maryland statute that the Government claims "bann[ed] the export of all firearms unless the owner was permanently relocating outside the jurisdiction," MTD at 12, does appear to have gone further and to have covered even privately owned firearms, but as with the 1775 Connecticut gunpowder statute, it was a wartime measure that on its face evinces its concern with ensuring that there were enough firearms in Maryland to carry out the Revolutionary War (for instance, other provisions of the same act appropriated public funds to purchase 600 muskets and exempted anyone working on manufacturing or repairing firearms for militia use from serving in the militia themselves). PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND 146–47 (1836), https://perma.cc/4AEL-NB5A. Indeed, the restrictions were explicitly temporary, *see id.* at 147 (forbidding export "without the

leave of the council of safety for the time being"), further demonstrating that they were exceptional wartime measures that were both unlike the Ban and motivated by different concerns.

***Registration laws.*** The government also cites an inapposite a pair of Virginia laws from 1631 and 1651 that, it claims, "created a registration regime that required the recording of all new arrivals to the colony, including their arms and munitions." MTD at 11. Even as described by the Government, it is not clear how such laws could have any relevance to the constitutionality of the Ban, and the Government offers no further explanation. But an examination of the laws proves they are inapposite. The 1631 law was a census law which required a periodic accounting not just of persons and firearms, but also "corne, cattle, hoggs, goates, barques, boates, gardens, and orchards." 1 HENING, *supra*, at 174–75. The 1651 "law" was actually a treaty between Virginia and England and required, in its thirteenth provision, that the colonists should be required to surrender all "powder and arms, other than for private use" to the King. *Id.* at 365. The treaty did not forbid the sale, import, or export of any arms and it explicitly exempted even from surrender arms "for private use." It is difficult to see what relevance it could possibly have to the Ban.

Furthermore, it is doubtful that any law or treaty ordering the surrender of colonial arms to the English government could possibly be a useful guide to understanding the Second Amendment. It rather seems like precisely the sort of intrusion into American rights that the Second Amendment was designed to prevent—not a terribly surprising fact given that it was enacted nearly forty years

before even the 1689 English Bill of Rights, the "predecessor to our Second Amendment," was adopted (in large part due to similar laws that disarmed those of whom the Crown was suspicious or jealous). *Heller*, 554 U.S. at 593 (discussing a 1671 law under which "the Catholic Charles II had ordered general disarmaments of regions home to his Protestant enemies"). Even in a more related case, such a law should almost certainly be totally disregarded as evidence of the scope of the Second Amendment.

   ***Import and Export Restrictions***. That leaves the government with just four laws that appear, in some sense, to have actually restricted inter-colonial commerce in firearms. But before discussing each of these specifically, it is worth noting a few overarching problems with them. The first is the same timing problem that makes the 1651 Virginia treaty just discussed such an unlikely guide to the scope of the Second Amendment: the earliest of these laws dates to 1642 and the latest to 1677. None were enacted within 100 years of the Second Amendment's ratification, and every one of them predates even the English Bill of Rights' more limited guarantee of the right to keep and bear arms. *See Bruen*, 597 U.S. at 34 ("Historical evidence that long predates either [the ratification of the Second or Fourteenth Amendments] may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years."). As such, without evidence of similar restrictions that survived to and existed at the Founding, they provide little insight as to "the scope [the Second Amendment] w[as] understood to have when the people adopted [it]." *Heller*, 554 U.S. at 634–35; *see also Bruen*, 597 U.S. at 41 (discounting the value of the Statute of

22

Northampton). Indeed, while here the government has four putative analogues from this period, in *Bruen* there were three and the Court entirely rejected reliance on them, suggesting that their remoteness from the Founding *alone* would be an adequate reason to disregard them. 597 U.S. at 46 ("For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.").

This remoteness in time is particularly salient here because one relevant "legal convention" underwent a major change between the mid-1600s and the ratification of the Second Amendment: the creation, through the Constitution, of a free-flowing system of interstate commerce. A "central concern" of the Framers, and "an immediate reason for calling the Constitutional Convention," was "the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979). In arguing for the Constitution's ratification, Alexander Hamilton stressed the value of "unrestrained intercourse between the States themselves," THE FEDERALIST NO. 11, at 71 (Jacob E. Cooke ed., 1961) (Alexander Hamilton), while Madison bemoaned "[t]he defect of power in the existing Confederacy to regulate the commerce between its several members," THE FEDERALIST NO. 42, at 283 (Jacob E. Cooke ed., 1961) (James Madison). And in the end, "[t]he power over commerce … was one of the primary objects for which the people of America adopted their government." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 190 (1824). The remaining laws on which the Government relies must be read in light of the fact that the Colonies in 1642 stood in

23

a fundamentally different relationship to one another (allies and competitors) than the States did in 1792 or do today (members of a single economic and national union).

Even aside from those shortcomings, these laws are inadequate to support the Ban. Begin with the 1642 Connecticut law that the Government claims "banned the sale of firearms by its residents outside the colony." MTD at 11. The Government's reading of the statute is not correct. The law appears not to have been a restriction on trading arms outside of Connecticut, but outside of the English colonies more generally, as part of a concerted effort to keep arms *within* "the Jurisdictions in combinatio[n]" or "the confederate jurisdictions" and out of the hands of the Native American tribes, or the Dutch and French who more freely traded with them. 1 TRUMBULL, *supra*, at 113–14, 138, 145–46 (1850), https://perma.cc/C562-NJ5R; *see also id.* at 138 (suggesting that "some consideration be taken to restrayne Roade Iland fro[m] trading w[i]th the [Native Americans] in such kynd"). Because they were aimed at restricting trade essentially *outside* of the "country" and not within it, and in fact permitted trade across colonial borders within the same broader nation, the law would be more akin to a restriction on selling firearms outside the United States, than it is to a Ban on selling to citizens of another state.

The Government's 1650 Connecticut law appears to have gone farther and actually did ban the sale of firearms to "any person inhabiting out of *this jurisdiction*, without license of this court or from some two magistrates." The First Code of Laws, May 1650, *in* TRUE-BLUE LAWS OF CONNECTICUT AND NEW HAVEN AND THE FALSE BLUE-LAWS INVESTED BY THE REV. SAMUEL PETERS 92 (J. Hammond Trumbull ed.,

1876), https://perma.cc/H4QJ-BXY8 (emphasis added). This law itself demonstrates that the earlier Connecticut law should not be read to have gone as far, since it begins by noting that those previous enactments had been insufficient to prevent "Indians … [from being] supplied by indirect means" with firearms and gunpowder. *Id.* And it is notably disanalogous to the Ban in "how" it restricted commerce in firearms in that a licensed individual, under this scheme, still *could* make sales across state lines. The Nonresident Handgun Purchase Ban *bars* licensed firearm sellers from selling handguns to nonresidents. It also differs in "why" it restricted the transfer of firearms, both because it was aimed at preventing the flow of arms to a group of people who were not part of the national community but with whom the colonists were frequently at war (the very next provision of the government's cited source makes it illegal for any colonists to "depart from amongst us, and take up their abode with the Indians, in a profane course of life," *id.*), and because it placed restrictions on trade between what were, at the time, separate colonies with other existing trade barriers between them, not states in an economic and national union.

Next the Government cites a 1677 Virginia law that "provid[ed] that all persons were at 'liberty to sell armes and ammunition to any of his majesties loyal subjects inhabiting *this colony*.'" MTD at 11 (quoting 2 WILLIAM WALTER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619 at 403 (1823)) (emphasis add by the Government). But a grant of authority to sell to "loyal subjects inhabiting this colony" is *not*, as the Government reads it, a ban on selling *outside* of the colony,

and the Government provides nothing to support this inference. In fact, the far better reading is that the statute implies that it was not legal to sell to *disloyal* subjects within the colony. Again, the timing of this enactment is critical. The year before, in 1676, Bacon's Rebellion, "the first major uprising by American colonists against colonial leadership" had swept across Virginia and resulted in the burning of its capitol city, Jamestown, to the ground. Edward St. Germain, *Bacon's Rebellion of 1676*, AMERICANREVOLUTION.ORG, https://perma.cc/5NDF-DLWG. In 1677, Virginia was not worried about sales to loyal or allied people outside of its jurisdiction, but to rebels, within or without. Consistent with this reading, the statute also permits the friendly "Indians of the Easterne shore … like and equal liberty of trade or otherwayes with any other our friends and neighbouring Indians." 2 WILLIAM WALLER HENING, STATUTES AT LARGE 403, https://perma.cc/9QB8-QW4Y.

Finally, the Government points to a 1652 New York law that it declares went furthest yet, "banning entirely the private trade of gunpowder, lead, and guns within the colony." MTD at 12. That is not at all clear from the record. For one thing, the text of the law itself, which is entitled "Of the Director and Council of New Netherland against Illegal Trade in Powder, Lead, and Guns in New Netherland by Private persons. *Passed April*, 1652," has been lost. LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 at 128 (E.B. O'Callaghan ed., 1868), https://perma.cc/9SYQ-QG8H. From its title, it appears directed only at "illegal trade" in firearms. The compiler of the laws, in addition to noting it is missing from historical records, also notes that it "seems, indeed, not to have been very strictly enforced," and that its true

aim, as with so many of the above statutes, was in fact the prevention of trade of ammunition and arms to Native Americans. *Id*. There is, in short, no basis on which to find it is an analogue for the Ban. *See Nguyen v. Bonta*, No. 24-2036, 2025 WL 1718079, at *7 n.4 (9th Cir. June 20, 2025) ("Because the exact text of this law is unavailable, we are unable to determine if this is a sufficient historical analogue.").

\*    \*    \*

In sum, far from showing that the American people have historically accepted limitations on the right to purchase firearms across state lines as a means to advance the goal of keeping prohibited persons from acquiring firearms, the Government's evidence demonstrates that to the extent any such laws existed at the Founding, they were much more limited wartime measures passed during the exigencies of the Revolutionary War and that even going back to the early colonial period, before there was a national union, there were few, if any, restrictions that resembled the Ban. The Government has therefore failed to carry its historical burden, and the Ban must be held unconstitutional.

## CONCLUSION

This Court should grant Plaintiffs' motion for summary judgment and deny the Government's motion to dismiss.

Dated: July 14, 2025

Respectfully submitted,

By: /s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

Cody J. Wisniewski*
FPC ACTION FOUNDATION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (615) 955-4306
Telecopy: (615) 334-0463
cwi@fpcafhq.org

R. Brent Cooper
Texas Bar No. 04783250
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

*Attorneys for Plaintiffs*

* Admitted pro hac vice

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served on all counsel of record via the Court's CM/ECF system this July 14, 2025.

By: /s/ David H. Thompson