UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| ELITE PRECISION CUSTOMS LLC, et al., *Plaintiffs*, v. THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al., *Defendants*. | No. 4:25-cv-00044 |

**COMBINED REPLY BRIEF OF DEFENDANTS IN SUPPORT OF MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**INTRODUCTION** ........................................................................................................................... 1

**ARGUMENT** .................................................................................................................................. 2

    I.    THE CHALLENGED REGULATORY REGIME IS A PRESUMPTIVELY CONSTITUTIONAL COMMERCIAL REGULATION ................................................................................................ 2

    II.    THE CHALLENGED REGULATORY REGIME IS CONSISTENT WITH THE NATION'S TRADITION OF GOVERNMENT REGULATION OF COMMERCIAL TRADE IN FIREARMS DUE TO CONCERNS THAT THE ARMS MIGHT FALL INTO DANGEROUS HANDS ......................... 5

    III.    SHOULD PLAINTIFFS PREVAIL ON THEIR MOTION FOR SUMMARY JUDGMENT, INJUNCTIVE RELIEF SHOULD BE LIMITED TO THE NAMED PLAINTIFFS ............................ 11

**CONCLUSION** ........................................................................................................................... 13

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Andrews v. State*,
  50 Tenn. 165 (1871) ................................................................................................. 3

*B&L Productions, Inc. v. Newsom*,
  104 F.4th 108 (9th Cir. 2024) .................................................................................... 4

*Bezet v. United States*,
  714 F. App'x 336 (5th Cir. 2017) .............................................................................. 4

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ................................................................................................ 12

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ............................................................................................. 2, 3

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ................................................................................................ 12

*Mance v. Sessions*,
  896 F.3d 699 (5th Cir. 2018) ............................................................................ 4, 5, 8

*Maryland Shall Issue, Inc. v. Moore*,
  116 F.4th 211 (4th Cir. 2024) .................................................................................... 5

*McCulloch v. Maryland*,
  4 Wheat. 316 (1819) ................................................................................................. 6

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) .................................................................................................. 2

*McRorey v. Garland*,
  99 F.4th 831 (5th Cir. 2024) .................................................................................. 2, 4

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) .............................................................................................. passim

*Nunn v. State*,
  1 Ga. 243 (1846) ....................................................................................................... 3

*Ortega v. Lujan-Grisham*,
  741 F.Supp.3d 1027 (D.N.M 2024) .......................................................................... 5

*State v. Reid,*
    1 Ala. 612 (1840) .................................................................................................................. 3

*Teixeira v. County of Alameda,*
    873 F.3d 670 (9th Cir. 2017) ........................................................................................ 4, 7, 9

*Trump v. CASA,*
    145 S. Ct. 2540 (2025) ........................................................................................................ 11

*United States v. Contreras,*
    125 F.4th 725 (5th Cir. 2025) .............................................................................................. 8

*United States v. Focia,*
    869 F.3d 1269 (11th Cir. 2017) ........................................................................................... 2

*United States v. Holton,*
    639 F. Supp. 3d 704 (N.D. Tex. 2022) ...................................................................... 5, 7, 8

*United States v. Libertad,*
    681 F. Supp. 3d 102 (S.D.N.Y. 2023) ......................................................................... passim

*United States v. Quiroz,*
    125 F.4th 713 (5th Cir. 2025) .............................................................................................. 6

*United States v. Rahimi,*
    602 U.S. 680 (2024) .......................................................................................................... 6, 7

*United States v. Serrano,*
    651 F. Supp. 3d 1192 (S.D. Cal. 2023) ............................................................................... 8

*United States v. Smith,*
    Crim. Action No. 22-10157-FDS, 2024 WL 328871 (D. Mass. Jan. 29, 2024) ..................... 2, 8

*Zherka v. Bondi,*
    140 F.4th 68 (2d Cir. 2025) ................................................................................................. 6

**Statutes**

1 Trumbull, *Public Records of the Colony of Connecticut* ............................................................. 9

18 U.S.C. § 922(b)(2) ........................................................................................................................ 4

1813 Il., An Act Prohibiting Trade with Indians, Sec. 2, in National Pope, Laws of the Territory of Illinois (1815) .............................................................................................................. 9

1860 Ga. Laws 56, Section 1 ........................................................................................................ 10

Act of May 22, 1794, Ch. 33, § 1 ................................................................................................. 10

Acts of Assembly, Mar. 1675-76, 2 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the year 1619 (1823) .................................................................................................................................. 9

An Act to Prevent the Exportation of Grain and Other Provision, and Arms, Ammunition, strouds, Duffils and Plains, from the Province of South Carolina, The Statutes at Large of South Carolina, No. 893 (1760) ............................................................................................................ 9

MS 1802, An Act to Regulate Trade and Intercourse with the Indian Tribes, Section 9, Miss. Code (Samuel Terrell 1807) ..................................................................................................... 9

Pennsylvania Act of Oct. 22, 1763, reprinted in VI The Statutes At Large of Pennsylvania from 1682 to 1801 ............................................................................................................................ 9

Proceedings for the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776 ................................................................................................................ 9

Virginia Act of Feb. 27, 1631, Act LVI, 1 Henning ................................................................. 7

**Rules**

Fed. R. Civ. P. 65(d)(1) ........................................................................................................... 12

**Other Authorities**

11A Charles Alan wright et al., *Federal Practice & Procedure* § 2955 (3d ed. 2024) ................ 12

Daniel D. Slate, *Infringed*, J. Am. Con. Hist. 381 (2025) .............................................................. 3

**INTRODUCTION**

The regulatory regime Plaintiffs challenge, which neither prevents Plaintiffs from possessing a handgun in any state for self-defense nor prevents Plaintiffs from purchasing a handgun from their retailer of preference, are presumptively constitutional commercial regulations. They impose, at most, a modest burden on the right to keep and bear arms by requiring purchasers of handguns to take possession of their purchased handgun from a Federal Firearms Licensee ("FFL") in their home state. Plaintiffs mischaracterize the challenged laws in their Response and Motion for Summary Judgement by calling these statutes the "Nonresident Handgun Purchase Ban."[1] Plaintiffs' Brief In Support of Response/Motion for Summary Judgement (hereinafter "Pls' Response"), at 1. But that is not an accurate description of the challenged laws, whatsoever. Nothing in the challenged laws stops an individual legally authorized to purchase a handgun from purchasing one from any retailer in any state, including Elite Precision.

Furthermore, the challenged laws fit comfortably into the nation's tradition of government regulation over the commercial trade in firearms due to concerns that the arms might fall into dangerous hands. The challenged laws are significantly less burdensome on the right to keep and bear arms than those from our history, some of which entirely foreclosed commercial transactions in firearms with specific groups of people. Plaintiffs fail to even engage with the principles underpinning our tradition. Instead, they mistakenly dismiss the various historical laws cited by the government as insufficiently similar to the challenged regulatory regime – in essence, requiring the government to identify a historical twin. But it is the challenged laws' consistency with the principles that underly our regulatory tradition that the Court must consider and, under that inquiry,

---

[1] Notably, Plaintiff Tom Herron admits that on multiple occasions he has purchased a handgun while out of state. Compl. ¶ 22. It is hard to see how that is consistent with the challenged regulations effecting a ban on such purchases.

they are constitutional. For these reasons, as explained further below, the Court should dismiss Plaintiffs' Complaint and deny their Motion for Summary Judgment.

**ARGUMENT**

I. **The Challenged Regulatory Regime is A Presumptively Constitutional Commercial Regulation**

The challenged laws are a component of a licensing requirement on the commercial sale and interstate transport of firearms. Consistent with Framing-era principles, modern precedent has recognized that reasonable commercial restrictions, like those challenged by Plaintiffs, do not infringe the Second Amendment. The Supreme Court has repeatedly emphasized that longstanding "laws imposing conditions and qualifications on the commercial sale of arms" are presumptively constitutional. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *see McRorey v. Garland*, 99 F.4th 831, 836-37 (5th Cir. 2024). That is exactly what the challenged laws do. *United States v. Focia*, 869 F.3d 1269, 1285-86 (11th Cir. 2017) (rejecting Second Amendment challenge to 18 U.S.C. § 922(a)(5) because it imposes conditions and qualifications on the commercial sale of arms.); *United States v. Libertad*, 681 F. Supp. 3d 102, 111 (S.D.N.Y. 2023) (rejecting Second Amendment challenge to 18 U.S.C. § 922(a)(3)); *United States v. Smith*, Crim. Action No. 22-10157-FDS, 2024 WL 328871 at *2 (D. Mass. Jan. 29, 2024) (same). Furthermore, *Bruen* made clear that laws, such as those challenged by Plaintiffs, *see* Defendant's Brief in Support of Motion to Dismiss (hereinafter "Def's Motion), at 13, which place threshold conditions on firearm acquisition designed to ensure that "those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens[,]" generally do not infringe on the Second Amendment right. *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1, 38 n.9 (2022) (approving of states' shall-issue licensing regimes) (citation omitted); *see id*. at 79-80 (Kavanaugh, J., concurring) ("Going forward,

2

therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").

That does not mean that all conditions and qualifications on the commercial sale of firearms pass constitutional scrutiny. Qualifications on the commercial sale of firearms that constitute an "infringe[ment]" on the Second Amendment right do not survive constitutional scrutiny. *See Id.* (Laws that are put to "abusive ends," such as by causing "lengthy wait times . . . or exorbitant fees [that] deny ordinary citizens their right to public carry" may fail constitutional scrutiny.)

As understood at the Framing, a law infringed a right when that law (1) served an illegitimate end, (2) regulated the right more broadly than necessary to accomplish legitimate ends, or (3) destroyed or nullified the right (regardless of whether it was necessary to achieve a permissible purpose). *See* Daniel D. Slate, *Infringed*, J. Am. Con. Hist. 381, 386 (2025) (defining infringed). Laws that prohibited abuses of the right or prescribed the manner of carrying out the right (e.g., specifying that voting was to take place on the first Tuesday after the first Monday in November) were mere regulations of rights; they did not constitute infringements or abridgements. *See, e.g.,* S*tate v. Reid,* 1 Ala. 612, 616 (1840); *Andrews v. State*, 50 Tenn. 165, 181, 186–87 (1871); *Nunn v. State*, 1 Ga. 243, 249 (1846). In contrast, laws designed to broadly frustrate a person's ability to acquire, possess, carry, and use arms are not constitutionally legitimate regulations of the right. *Heller*, 554 U.S. at 629; *see Reid*, 1 Ala. at 616–17 (1840); *Nunn*, 1 Ga. at 249 ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.").

The regulatory regime Plaintiffs challenge does not constitute an infringement of the Second Amendment right. Plaintiffs identify two burdens on the right that result from the

3

challenged regime: increased cost and slight delay in taking possession of a newly purchased handgun. Complaint ¶ 19. But these burdens, which do not prevent Plaintiffs from possessing a handgun in Texas or anywhere else they are legally authorized to do so, in no way destroy or nullify the right to "keep and bear Arms." The costs, which are set by the FFLs, added by arranging these transfers do not make firearms prohibitively expensive. *See Bezet v. United States*, 714 F. App'x 336, 341 (5th Cir. 2017) (concluding that a $200 firearms tax is a "relatively light burden[.]") And, under binding Fifth Circuit precedent, there is no Second Amendment right to take delivery of a firearm without delay. *McRorey*, 99 F.4th at 839 (upholding background checks that include a ten-day delay); *see also B&L Productions, Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) ("[G]un buyers have no right to have a gun store in a particular location.") (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (en banc).

These burdens, moreover, are no greater than necessary to accomplish Congress's objectives. When it passed the Federal Firearms Act in 1938, Congress had tried a licensing system that permitted interstate sales. But that system resulted in rampant evasion of state law. Congress, thus, acted reasonably when it tightened the restrictions on interstate sales in 1968 by directing handgun transfers to occur through an FFL in the purchaser's home state. Doing so backstops state licensing regimes by preventing purchasers from making an end-run around their state's handgun laws by traveling elsewhere. Because FFLs are required to ensure that the purchaser is eligible to acquire and possess the handgun they seek to acquire in their state of residence, 18 U.S.C. § 922(b)(2), Congress determined that it was reasonable to expect FFLs to master their state and local laws. *Mance v. Sessions*, 896 F.3d 699, 708 (5th Cir. 2018) (rejecting Second Amendment challenge to the same laws challenged by Plaintiffs). Plaintiffs would have

4

this Court make FFLs responsible for mastering the laws of every state – something we do not expect of even attorneys. *Id.* at 707-08.

The mere existence of a minimal burden on the right to acquire arms does not constitute an infringement of the right. *Bruen* 597 U.S. at 38, n. 9 (approving of shall-issue licensing regimes)*; Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc) (upholding Maryland's shall-issue licensing regime that caused both delay and increased cost in acquiring a firearm); *Ortega v. Lujan-Grisham*, 741 F.Supp.3d 1027, 1076-85 (D.N.M 2024) (challenge to New Mexico's waiting period act did not implicate the Second Amendment). While a delay could be so substantial as to impermissibly burden the right to possess and carry a firearm, "[t]he delay incurred if a handgun is purchased out of state and transferred to an in-state FLL is de minimis." *Mance*, 896 F.3d at 709. Rather, as the Fifth Circuit observed, "[t]he challenged federal gun laws allow ample access to handguns by those who are permitted to possess and purchase them under state and local laws." *Id.* Thus, Plaintiffs' challenge must fail and Defendant's Motion to Dismiss should be granted.

II. **The Challenged Regulatory Regime is Consistent with the Nation's Tradition of Government Regulation Of Commercial Trade in Firearms Due to Concerns that the Arms Might Fall into Dangerous Hands**

The Supreme Court has clearly pronounced that the purpose of the challenged laws, which is to ensure that those acquiring firearms are law-abiding, responsible citizens, Def's Motion, at 13, is permissible under the Second Amendment. *Bruen* 597 U.S. at 38, n.9 (citation omitted). And the challenged laws achieve that purpose by imposing a minimal burden on the right to keep and bear arms in a manner comfortably within the nation's tradition of firearms regulations. *Libertad*, 681 F. Supp. 3d at 112-15 (holding that the criminal statute prohibiting interstate transportation of firearms—18 U.S.C. § 922(a)(3)—is consistent with the nation's tradition of firearms regulations);

5

*see United States v. Holton*, 639 F. Supp. 3d 704, 711 (N.D. Tex. 2022) (concluding that "colonial governments substantially controlled the firearms trade" including by restricting "where and to whom individuals could sell guns" to hold that statutes criminalizing possession of an unregistered firearm and possession of a firearm having the serial number removed or altered fell within the nation's tradition of firearms regulation).

Just last year, the Supreme Court emphasized that the analysis at *Bruen's* step two is about "consisten[cy] with the **principles** that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (emphasis added). That focus is because "the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs[,]'" *Bruen*, 597 U.S. at 28 (quoting *McCulloch v. Maryland*, 4 Wheat. 316 (1819)), and Courts must interpret it so as not to leave a "law trapped in amber." *Rahimi*, 602 U.S. at 691. The methodology set out in *Rahimi* is designed to "permit[] a historical inquiry calibrated to reveal something useful and transferable to the present day[.]" *Id.* at 702 (Sotomayor, J., concurring). As the Supreme Court and Fifth Circuit have recognized, "[t]he regulatory challenges posed by firearms today 'implicat[e] unprecedented social concerns [and] dramatic technological changes.'" *United States v. Quiroz*, 125 F.4th 713, 717 (5th Cir. 2025) (quoting *Bruen*, 597 U.S. at 27); *see Zherka v. Bondi*, 140 F.4th 68, 79 (2d Cir. 2025) ("In line with the Court's precedent, we have similarly acknowledged that a more nuanced approach to analogizing to history will often be necessary in cases concerning new circumstances or modern regulations that were unimaginable at the founding, such as regulations addressing unprecedented societal concern or dramatic technological changes.") (internal quotations omitted)). For example, and relevant to the challenged laws here, widespread fast and easy interstate travel and trade was not possible at the time of the Founding as it is today. At the

6

Founding, the challenged laws would likely have delayed taking possession of the purchased handgun for weeks or months, whereas today it is merely days.

In upholding the statute criminalizing possessing a firearm by somebody subject to a domestic violence restraining order in *Rahimi*, the Court rejected the practice of some courts post-*Bruen* to require the government identify a historical twin. *See Rahimi*, 602 U.S. at 691. Yet, Plaintiffs fail to heed the Supreme Court's directive by failing to even engage with the principles identified by the government. Instead, Plaintiffs take the historical regulations identified by the government and reject them one-by-one because Plaintiffs contend they differed from the challenge regulations in various ways. Pls' Motion, at 15-27. In so doing, Plaintiffs seemingly hold the government to the historical twin standard. This approach, which tells us nothing about the principles underpinning our tradition of firearms regulation or their application to the challenged laws, was explicitly rejected in *Rahimi*. *Id*. at 700-02; *id.* at 704 (Sotomayor concurring).

The laws cited by the government show that there is a tradition of government regulation over the commercial trade in firearms due to concerns that the arms might fall into dangerous hands; and Courts throughout the country agree. *See, e.g., Teixeira*, 873 F.3d at 685-87 (citing a Connecticut law banning the sale of firearms by its residents outside the colony and various laws banning commerce in firearms with Native Americans to conclude that colonial governments controlled the firearms trade including by imposing bans and geographical restrictions on the sale of arms); *Holton*, 639 F. Supp. 3d at 711-12 (citing the Virginia Act of Feb. 27, 1631, Act LVI, 1 Henning 174-75, which created a registration regime for new arrivals to the colony, including their arms and ammunitions, laws requiring individuals with a gun to show up and register their firearm, and laws imposing taxes on the possession of firearms, among others, to conclude that our

7

historical firearms regulatory tradition includes "controlling and tracing the sale of firearms and [] ensuring dangerous individuals did not obtain firearms."); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1211-12 (S.D. Cal. 2023) (identifying a Connecticut law banning the sale of firearms by residents outside its borders, a New York law banning illegal trade in guns, gun powder, and lead by private individuals, the same Virginia Act cited in *Holton*, and bans on the sale of firearms to Native Americans as "designed to combat illegal arms and ammunition trafficking and to ensure that individuals considered dangerous did not obtain firearms."). This principle, and these decisions, are consistent with the *Bruen*'s approval of shall-issue licensing regimes, which impose conditions and qualifications on the commercial sale of firearms to ensure that firearms do not fall into the wrong hands. *See Bruen*, 597 U.S. at 38, n.9.

Having established that there is tradition of government regulation over the commercial trade in firearms due to concerns that the arms might fall into dangerous hands, the analysis turns to comparing the burden of the challenged laws with that imposed by historical regulations, looking to see if the modern law imposes a greater burden than the historical laws. *Id.* at 29; *cf. United States v. Contreras*, 125 F.4th 725, 733 (5th Cir. 2025) (acknowledging that 922(g)(1) imposes a greater burden than the historical laws but upholding the law because the purpose of the law is heightened). The burden imposed by many of the historical laws is far more substantial than the modest burden from the challenged laws. The Fifth Circuit has already found that the burden of the challenged laws on the right to keep and bear arms is minimal and that any delay incurred by purchasing a handgun out of state is "de minimis." *Mance*, 896 F.3d at 709 ("The challenged federal gun laws allow ample access to handguns by those who are permitted to possess and purchase them under state and local laws."); *see also United States v. Smith*, Crim. Action No. 22-10157-FDS, 2024 WL 328871 at *2 (D. Mass. Jan. 29, 2024) (rejecting a challenge to section

8

922(a)(3) because it "does not burden an individual's right to possess a firearm for legitimate purposes of self-defense" and "leaves open ample alternative means of acquiring firearms" for doing so) (internal quotations omitted). The historical laws, on the other hand, were not so restrained and various laws entirely foreclosed commercial transactions in firearms to non-residents, *see, e.g., Teixeira*, 873 F.3d at 685 (citing 1 Trumbull, *Public Records of the Colony of Connecticut*, 138-39, 145-46) ("Connecticut banned the sale of firearms by its residents outside the colony[,]"), banned the export of firearms, *see, e.g.,* Proceedings for the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776, at 147 (banning the export of firearms for commercial purposes), An Act to Prevent the Exportation of Grain and Other Provision, and Arms, Ammunition, Strouds, Duffils and Plains, from the Province of South Carolina, The Statutes at Large of South Carolina, No. 893 (1760) (banning the export of firearms), and banned the sale of firearms to entire classes of people who were not citizens of the colony or state because that could result in firearms getting into the hands of those deemed dangerous. *See, e.g.,* Pennsylvania Act of Oct. 22, 1763 reprinted in VI The Statutes At Large of Pennsylvania from 1682 to 1801, 319 (James T. Mitchell & Henry Flanders eds., 1899) (banning the sale of firearms to Native Americans); MS 1802, An Act to Regulate Trade and Intercourse with the Indian Tribes, section 9, Miss. Code (Samuel Terrell 1807) (law passed 1802) (same); 1813 Il., An Act prohibiting trading with Indians, Sec. 2, in National Pope, Laws of the Territory of Illinois (1815) (same); Acts of Assembly, Mar. 1675–76, 2 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 336–37 (1823) (criminalizing the mere possession of more arms and ammunition than one could need for personal use within a Native American town or more than three miles from an English plantation); An Act Making it Penal to Sell to or Furnish Slaves or Freepersons of Color

with Weapons of Offense and Defense, pt. 1, tit. 19, no. 64, § 1, 1860 Ga. Acts 54, 56 (Boughton, Nisbet, & Barnes) (Georgia).[2]

The historical analysis employed in *Libertad* further illustrates how the challenged regulations fit within our historical tradition of firearms regulation. *Libertad* involved a Second Amendment challenge to 18 U.S.C. § 922(a)(3), the criminal statute prohibiting people from bringing into their states of residence firearms purchased or obtained out-of-state, which Plaintiffs also challenge here. *Libertad*, 681 F. Supp. 3d at 106. The Court observed that there was a line of relevant historical regulations regarding the "how" of section 922(a)(3) and another regarding the "why." *Id*. To determine that there is a well-grounded principle in our nation's history of firearms tradition of regulating the movement of firearms between colonies, the Court began by looking to laws restricting firearms transactions with Native Americans. *Id*. at 112-13. The Court also took note of a law passed by the Third Congress making it unlawful to export arms from the United States and evidence of enforcement of that law. *Id*. (citing Act of May 22, 1794, Ch. 33, § 1). While the Court observed that "it was likely the statute was aimed at ensuring the overall stock of weapons available in this country not be depleted," it was enlightening with regard to the "how" as "powerful evidence that an early congress believed it could, consistent with the Second Amendment, place quite sweeping restrictions on the passage of firearms across borders." *Id*. at 113-14. The Court concluded its "how" analysis by looking to various colonial and early state statutes regulating the importation and exportation of gun powder. *Id*. at 114. While acknowledging that these laws "likely were motivated by a desire to keep weapons inside the particular polity for purposes of self-defense," *id*., which Plaintiffs also argue, Pls' Motion, at 18-

---

[2] While such laws discriminating based on race and origin are repugnant and unacceptable today, the historical nature of the inquiry requires considering these laws and what they show about the nation's tradition of regulating commercial firearms activity to prevent firearms from falling into the hands of the wrong people.

10

21, the Court concluded that "they nonetheless demonstrate the expansive authority exercised by colonial and early state legislatures as well as early congresses over the transfer of firearms between individuals and across borders." *Libertad*, 681 F. Supp. 3d at 114.

In its "why" analysis, the Court found "an extensive history in both England and the colonies of disarming those deemed dangerous and requiring large swathes of the citizenry to swear loyalty oaths in order to demonstrate they were not dangerous." *Id*. The Court found it notable that these loyalty oaths exhibited a tradition of imposing a "slight threshold burden on all or at least a large portion of gunowners, most of whom were likely entitled to keep and bear arms, to demonstrate that they were so entitled and not dangerous." *Id*. at 115. Accordingly, the "why" and the "how" bear similarities to those behind § 922(a)(3) in that they "impos[e] a slight threshold burden on gun ownership designed so as 'to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.'" *Id*. (quoting *Bruen*, 597 U.S. at 38, n. 9).

### III.  Should Plaintiffs Prevail on Their Motion for Summary Judgment, Injunctive Relief Should be Limited to the Named Plaintiffs

Plaintiffs request this court enter a "permanent injunction enjoining Defendants' enforcement or application of the" challenged regulatory regime. Complaint at 12. If the Court grants an injunction, that injunction should extend no further than to bar enforcement of any laws the Court deems unconstitutional against the named plaintiffs specifically identified in the complaint.

In *Trump v. CASA*, the Supreme Court explained that "Congress has granted federal courts" no power to enter universal injunctions. 145 S. Ct. 2540, 2548-54 (2025). Instead, the governing principle is that a court granting equitable relief "may administer complete relief *between the parties*." *Id*. at 2557. (quotation omitted). "Under this principle, the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it

11

is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id*. And even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id*. at 2558. Thus, "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Id.* (quotation omitted).

Here, Plaintiffs include two individuals, a firearms retailer, and an association. Relief for the individuals and firearms retailer is simple enough because they have identified themselves – an injunction against the government enforcing any of the laws the Court deems unconstitutional specifically against them. But relief for the associational plaintiff is more complicated because it does not specifically identify any members other than the co-plaintiffs. The remaining members of the association have not come before the court and have not agreed to be bound by its judgment. Granting relief to the unidentified members of the association would enable them to enjoy the benefits of a favorable judgment while escaping the burdens of an adverse one. Courts may not grant relief to members who were not identified in the complaint and who did not agree to be bound by the judgment. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring). Article III confines courts to "adjudicating rights in particular cases between the litigants brought before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973).

Extending relief to the association's absent members is in substantial tension with the rule that "[e]very order granting an injunction" must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). That rule exists to ensure that "an ordinary person reading the court's order [can] ascertain from the document itself exactly what conduct is proscribed." 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2955 (3d ed. 2024). Because the association has not identified any of its

12

members other than the named plaintiffs, the government would have no way to know whom an injunction restricting enforcement of the challenged laws covers. Thus, should the Court find for the plaintiffs and find that an injunction is appropriate, the injunction should apply only to the specific named plaintiffs identified in the complaint.

## **CONCLUSION**

The challenged regulatory regime is a presumptively constitutional commercial law that imposes a minimal burden on the right to keep and bear arms. They in no way restrict Plaintiffs from keeping and bearing a handgun in Texas, or any other state. They result merely in a small delay and likely fee reasonable fee on the purchase of a handgun by somebody outside their home state. These modest burdens are significantly less than those imposed by historical regulations of commerce in firearms, the principles of which the challenged regulatory regime is firmly entrenched. As such, Plaintiffs' Motion for Summary Judgement should be denied, Defendant's Motion to dismiss should be granted, and Plaintiffs' complaint should be dismissed.

Dated: August 13, 2025                                      Respectfully submitted,

        BRETT A. SHUMATE
        Assistant Attorney General
        Civil Division

        ANDREW I. WARDEN
        Assistant Branch Director

        */s/ Samuel Bean*
        SAMUEL BEAN (MD)
        Trial Attorney
        U.S. Department of Justice
        Civil Division, Federal Programs Branch
        P.O. Box 883
        Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 455-9619
        Samuel.B.Bean2@usdoj.gov

        *Counsel for Defendants*