UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**ELITE PRECISION CUSTOMS LLC, ET AL.,**

  Plaintiffs,

v.                                          No. 4:25-cv-00044-P

**BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, ET AL.,**

  Defendants.

## OPINION & ORDER

Before the Court are two motions. The first is a Motion to Dismiss filed by the Bureau of Alcohol, Tobacco, Firearms and Explosives; James R. McHenry, III, in his official capacity as Acting Attorney General of the United States; and Marvin G. Richardson, in his official capacity as the Acting Director of ATF (collectively, ATF or the Government). ECF No. 37. The second is a Motion for Summary Judgment filed by Elite Precision Customs LLC (Elite Precision), Tim Herron, Freddie Blish, and Firearms Policy Coalition, Inc. (collectively, Plaintiffs). ECF No. 39. Having considered the Motions, briefs, and applicable law, the Court will **GRANT** the Government's Motion and **DENY** Plaintiffs' Motion.

## BACKGROUND

Federal law makes it a crime to sell, buy, or transport firearms in interstate commerce without a license. As a result, a customer who wishes to purchase a firearm while traveling out of state must arrange for the firearm to be transported to a licensed dealer in his home state. Here, Plaintiffs are two out-of-state firearm customers, one local company that manufactures and sells firearms, and an organization that represents the interests of firearm owners throughout the country. They bring this suit challenging the interstate sale restrictions, arguing they violate the Second Amendment.

The federal statutes criminalizing the unlicensed interstate commerce of firearms (collectively, the Sale Restrictions) are found in 18 U.S.C. § 922. Subsection (a)(3) of the statute makes it a criminal offense for anyone other than a federally licensed firearm dealer (Licensed Dealer) to transport firearms from another state into one's state of residence.[1] Similarly, subsection (a)(5) likewise prohibits the sale or transfer of a firearm by an unlicensed person to a resident of another state.[2] The law makes some exceptions. For example, transfers by bequest or intestate succession between residents of different states are excluded from the offenses. *Id.* § 922(a)(3)(A). So are loans or rentals of firearms for "temporary use for lawful sporting purposes." *Id.* § 922(a)(5). Subsection (b)(3) further prohibits Licensed Dealers from selling or delivering firearms to any person the Dealer ought to know

---

[1] "It shall be unlawful . . . for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter[.]" 18 U.S.C. § 922(a)(3).

[2] "It shall be unlawful . . . for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes[.]" *Id.* § 922(a)(5).

resides in a different state.[3] An exception to Subsection (b)(3) permits the sale of any rifle or shotgun if the buyer meets with the seller in person and the sale complies with the laws of the buyer's and seller's home states. *Id.* § 922(b)(3). A regulation, codified at 27 C.F.R. § 478.99(a), tracks the language of the statute.[4] *See* 18 U.S.C. § 926(a) (authorizing Attorney General to prescribe rules and regulations necessary to carry out provisions of firearms law).

Ultimately, Congress passed the Sale Restrictions in 1968 because it found that interstate commerce provided an easy way for citizens to evade their states' gun laws. Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(1), 82 Stat. 225; S. REP. NO. 89-1866, at 18–19 (1966). Citizens could circumvent their states' laws by buying guns from out-of-state dealers either through the mail or over

---

[3]"It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver . . . any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes[.]" *Id.* § 922(b)(3).

[4]"A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in (or if a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business or activity is located: *Provided*, That the foregoing provisions of this paragraph (1) shall not apply to the sale or delivery of a rifle or shotgun (curio or relic, in the case of a licensed collector) to a resident of a State other than the State in which the licensee's place of business or collection premises is located if the requirements of § 478.96(c) are fully met, and (2) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes (see § 478.97)." 27 C.F.R. § 478.99(a).

the counter. S. REP. NO. 89-1866, at 61. The Sale Restrictions aimed to help states enforce their own laws, which in turn served Congress's policy goal of responding to violent crime. The Sale Restrictions supplemented federal regulations like licensing requirements, customer record mandates, and restrictions on classes of customers. Congress found that those existing controls were insufficient to address the problem of violent crime that, in its view, affected interstate commerce. *See* H.R. REP. NO. 90-1577.

In this case, Elite Precision manufactures and sells custom firearms from Mansfield, Texas. It holds a federal license to do both. When Elite Precision has customers who reside in other states but want to buy a handgun from its store, it must advise the would-be customer that federal law prohibits a direct sale. Instead of selling directly to the customer, Elite Precision must structure the transaction to comply with federal law by arranging for the firearm to be sent to a Licensed Dealer in the customer's home state. Once the firearm is delivered to a Licensed Dealer in the customer's home state, they can then take possession of the gun there. Those extra steps make handgun purchases more expensive for out-of-state purchasers. *See generally* ECF No. 41 at App. 1–2.

Freddie Blish is a retired Lieutenant Colonel in the United States Marine Corps who resides in Arizona. He travels around the country teaching courses on the safe handling of handguns for self-defense. While on the road, Blish frequently visits the establishments of Licensed Dealers in other states. He has declined to buy handguns from them, but he says that but for the Sale Restrictions, he would, including from Elite Precision specifically. *See generally* ECF No. 41 at App. 3–4.

Tim Herron is a Grand Master in the United States Practical Shooting Association and a resident of New Mexico. He travels across the country to participate in shooting competitions and teach shooting classes. Like Blish, Herron often visits Licensed Dealers in states other than his own. Once or twice a year, he purchases a handgun from an out-of-state dealer by having the dealer ship the gun to a Licensed Dealer in New Mexico. The process adds $30–40 to the cost of the purchase and prevents him from taking immediate possession of the

4

handgun. But for the Sale Restrictions, Herron says he would buy a handgun from Elite Precision directly. *See generally* ECF No. 41 at App. 7–8.

Firearms Policy Coalition, Inc. (FPC) is a nonprofit membership association based in Nevada. Its goal is to help create "a world of maximal human liberty and freedom" by "protecting, defending, and advancing the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms, and protecting the means by which individuals may exercise the right to carry and use firearms." ECF No. 41 at App. 5. Blish, Herron, and Elite Precision are all members of FPC.

Plaintiffs sued the ATF, the Attorney General of the United States, and the Acting Director of ATF (the Government), seeking a permanent injunction of the Sale Restrictions. Plaintiffs contend that the Sale Restrictions violate the Second Amendment of the United States Constitution and are therefore void and unenforceable. FPC brings its claims on behalf of customers and dealers who hold membership in the organization. Because no factual issues arose in this case, the Court ordered the Parties to brief the legal issues. The Government moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Plaintiffs moved for summary judgment under Rule 56. ECF Nos. 37, 39. The motions are ripe for review.

## LEGAL STANDARD

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement of relief. *Id.* at 678.

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled

to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence presented would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242–43 (1986). And a fact is "material" when it might affect the outcome of a case. *Hobby Distillers Ass'n v. Alcohol and Tobacco Tax and Trade Bureau*, 740 F. Supp. 3d 509, 517 (N.D. Tex. 2024). When determining whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). In conducting its evaluation, the Court may rely on any admissible evidence of record but need only consider materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3).

Because there are no factual issues, the determinative inquiry is which Party is entitled to judgment as a matter of law. The Parties' motions are a vehicle for presenting to the Court a question of law: Are the Sale Restrictions constitutional?

## ANALYSIS

To successfully challenge a firearms regulation under the Second Amendment a plaintiff must satisfy a two-step test. *First*, the plaintiff must show that the plain text of the Second Amendment covers the proscribed conduct. If the Second Amendment covers the conduct, it follows that "the Constitution presumptively protects [it.]" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). In that case, the burden shifts to the government, and the inquiry continues to step two. To defend the challenged regulation at the *second* step, the government must show that the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

To make that showing, the government must provide evidence of analogous regulations from around the Founding era,[5] when the Second

---

[5] The Court emphasizes that it does not herein opine on whether the Second Amendment analysis requires examination of historically analogous laws from 1791 (the ratification of the Second Amendment) or from 1868 (the ratification of the 14th Amendment and application of the Second Amendment against the states). That legal question is yet to be settled. *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133

Amendment was ratified. The founding-era example need not be a "dead ringer" for, or a "historical twin" of, the challenged regulation, but it must be "relevantly similar" using "commonplace" analogical legal reasoning. *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Whether a similarity is relevant depends on the answers to two questions—*why* and *how*. The first question asks what social ills the government seeks to lessen by placing a burden on the natural right to armed self-defense. *Id.* And the second asks whether the law burdens the Second Amendment right "to an extent beyond what was done at the Founding." *Id.*

The Sale Restrictions have been challenged in this Court before. *See Mance v. Holder*, 74 F. Supp. 3d 795 (N.D. Tex. 2015) (O'Connor, J.). In that case, Judge O'Connor applied means-end scrutiny, the approach commonly used by federal courts in constitutional contexts. *Id.* Judge O'Connor held that the Sale Restrictions did not pass strict scrutiny and enjoined their enforcement. *Id.* at 811–12. On appeal, the United States Court of Appeals for the Fifth Circuit reversed. *Mance v. Sessions*, 896 F.3d 699 (2018). And the Supreme Court denied the petition for certiorari. 141 S. Ct. 123 (2020).

Subsequently, the standard by which courts analyze Second Amendment questions was changed by the Supreme Court in *Bruen*. In doing so, the Supreme Court explained that lower courts had erred in adopting means-end scrutiny as the standard of Second Amendment challenges and clarified the "history and tradition" standard that courts are now bound to follow. *Bruen*, 597 U.S. at 19. Plaintiffs now ask the Court to review the challenge to the Sale Restrictions with fresh eyes, applying the *Bruen* standard.

The Court finds that the Sale Restrictions do not regulate conduct that falls within the "plain text of the Second Amendment." *Bruen*, 597 U.S. at 24. Therefore, they do not trigger the second step of the analysis.

---

YALE L.J. 99, 128 (2023) ("[T]he majority opinion [in *Bruen*] . . . does not resolve the question of whether 1791 or 1868 is the relevant date for historical analysis—an important issue for originalists." (cleaned up)).

### A. The Second Amendment's Plain Text Does Not Cover Conduct Prohibited by the Second Amendment.

The first step requires an analysis of the latter portion of the Second Amendment text: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The first clause of the Amendment is prefatory: "A well-regulated Militia, being necessary to the security of a free State . . . " *Id*. The prefatory clause does not expand or diminish the scope of the right protected by the second clause: " . . . the right of the people to keep and bear Arms, shall not be infringed." *Id*.; *District of Columbia v. Heller*, 554 US. 570, 578 (2008). Instead, it announces the purpose for codifying the right to bear arms in the following part of the sentence. *Id*. at 599. Therefore, the Court looks to the main clause—"the right of the people to keep and bear Arms, shall not be infringed." That clause determines whether the conduct forbidden by the challenged laws is "presumptively protect[ed]."

*First*, the Court has no trouble finding that the Sale Restrictions apply to "the people." *See United States v. Diaz*, 116 F.4th 458, 466 (5th Cir. 2024) (including even felons within Second Amendment's reference to "the people"); *cf. Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 748 (N.D. Tex. 2022) ("[T]he Court concludes that law-abiding 18-to-20-year-olds are a part of "the people" referenced in the Second Amendment.") (Pittman, J.). Thus, the only dispute at the first step is whether the Sale Restrictions implicate the Second Amendment. As a necessary predicate to the right to keep and bear arms, the right of acquisition is protected, too, particularly when the prohibitions turn "into functional prohibitions on keeping." *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024). If it were not, the plain text of the Second Amendment would be stripped of all substance. *See Knife Rts., Inc. v. Bondi*, 785 F. Supp. 3d 195, 212–13 (N.D. Tex. 2025) (citing *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them . . . .")) (Pittman, J.). Consequently, the question before the Court is whether the Sale Restrictions are "presumptively lawful regulatory measures," *Heller,* 554 U.S. at 626–27

8

n.26, or serve as "a de facto prohibition on possession," *Knife Rts., Inc.*, 785 F. Supp. 3d at 214 (collecting cases).

> 1. <u>Conditions on Purchasing Firearms Presumptively Fall Outside of the Second Amendment's Purview.</u>

The plain text of the Second Amendment does not cover the conduct regulated by the Sale Restrictions. When a condition on sale incurs a slight delay on possession and increased cost as here, the Second Amendment is not implicated. The Sale Restrictions do not regulate the right to keep and bear arms—only the ability to purchase them in specific and narrow circumstances, and thus ultimately the manner in which they can be acquired. Under *Heller*, "laws imposing conditions and qualifications on the commercial sale of arms" are examples of "presumptively lawful regulatory measures." 554 U.S. at 626–27 n.26.

For instance, the Fifth Circuit upheld an expansion of federal background check procedures that required a ten-day waiting period before a customer could take possession of a firearm. *McRorey*, 99 F.4th at 839–40. While the Fifth Circuit stated that an indefinite waiting period might implicate the Second Amendment, it found that the ten-day period was not abusive or a *de facto* ban and was thus a lawful regulatory measure. *Id.* The Fifth Circuit, and other courts, have upheld these types of requirements because they "do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right[s.]" *Bruen*, 597 U.S. at 38 n.9. Rather, they "ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* Therefore, when the Fifth Circuit reviewed the recently expanded federal background check requirement under *Bruen*, it found the law constitutional at step one of *Bruen*. *McRorey*, 99 F.4th at 838. In other words, the federal background check requirement did not implicate the plain text of the Second Amendment. *Id.*

In contrast, the Fifth Circuit in *Reese v. Bureau of Alcohol, Tobacco, and Firearms*, held a federal ban on sales to persons under the age of twenty-one by federally licensed firearms dealers unconstitutional. 127 F.4th 583, 586 (5th Cir. 2025). In *Reese*, the Fifth Circuit acknowledged its holding in *McRorey* but distinguished the statute at issue. It held

9

that it amounted to a total ban and concluded that such a prohibition was facially unconstitutional. *Id.* at 589–90, 600. In that case, the Court dealt with an outright ban "of the most common way for a young adult to secure a firearm" and thus functionally a ban on keeping firearms. *Id.* at 590 n.2.

And the Fifth Circuit's decision in *Reese* is consistent with what other circuits have done in analogous cases. *See, e.g., B&L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) (upholding a law which prohibited the sale of firearms on certain fairgrounds or on any state property). As a result of those statutes, it became illegal for dealers to host gun shows where guns and ammunition were sold. *See id.* at 111. That court held that the challenged statutes did not implicate the Second Amendment because they only placed a "minor constraint on the precise locations within a geographic area where one can acquire firearms." *Id.* at 119. The impact of those restrictions resembles the effect the Sale Restrictions have on Plaintiffs. The Ninth Circuit commented that "attendees of gun shows in California can peruse such offers, leave the premises, and immediately order their desired goods from the vendor." *Id.* They simply could not complete the sale at the fairgrounds. *Id.* at 119–20. "Nothing in the Second Amendment's text," the court concluded, "provides a right to the contrary." *Id.* at 120.

The Ninth Circuit gave a helpful exposition of the logical relationship between *Heller*'s approval of conditions on firearms sales and *Bruen*'s "plain text" threshold question:

> The Court explicitly framed "laws imposing conditions and qualifications on the commercial sale of arms" as "*presumptively lawful* regulatory measures." *Heller*, 554 U.S. at 626–27 & n.26, 128 S.Ct. 2783 (emphasis added); *see also* Bruen, 597 U.S. at 81, 142 S.Ct. 2111 (Kavanaugh, J., concurring). For any law to be "presumptively lawful," it necessarily must not implicate the plain text of the Second Amendment. Otherwise, *Bruen* makes clear that the Constitution would "presumptively *protect*[ ] that conduct," and the government would bear the burden of identifying a historical tradition of similar regulation. *Id.* at 17, 142 S.Ct. 2111 (emphasis added). The most reasonable interpretation of that passage is that

> commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test.

*B&L Prods.*, 104 F.4th at 118–19. Thus, laws that implicate the Second Amendment's plain text are presumptively unconstitutional. Conditions and qualifications on the commercial sale of firearms are not presumptively unconstitutional. Therefore, conditions and qualifications on the commercial sale of firearms do not implicate the Second Amendment's plain text.

That is not to say that conditions on the sale of firearms are necessarily constitutional. The presumption of lawfulness can be rebutted. Laws "infringe" the Second Amendment right if they serve an illegitimate purpose aimed at repressing the right, regulate the right more broadly than needed for a legitimate purpose, or effectively destroy the right. *See* Daniel D. Slate, *Infringed*, J. AM. CON. HIST. 381, 386, 391, 441 (2025). For example, the "shall-issue" licensing schemes that the Supreme Court endorsed as constitutional in *Bruen*, if "put toward abusive ends," may have the effect of infringing the people's Second Amendment rights. *Bruen*, 597 U.S. at 38 n.9. And the natural right to keep and bear arms often implicates the right to purchase. *McRorey*, 99 F.4th at 838. That is why, after concluding that the background check requirement in *McRorey* did not implicate the Second Amendment, the Fifth Circuit asked whether the "presumptively lawful regulations have been 'put towards abusive ends' . . . ." *Id.* at 839 (they had not). In other words, these conditions should be "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" by application of "narrow, objective, and definite standards" and no more. *Bruen*, 597 U.S. at 38 n.9 (cleaned up). Moreover, a delay is lawfully permissible. In *McRorey*, the delay was ten days, and while the Fifth Circuit admitted that there may be some undefined length of time that would make a delay unconstitutional, the ten-day period appeared to nowhere approach that undefined marker. *McRorey*, 99 F.4th at 840.

2. The Sale Restrictions Lawfully Impose a Modest Inconvenience on Firearms Purchasers.

The case at hand fits those standards: The Sale Restrictions are meant to protect the integrity of state laws, impose a modest delay in time and cost, and use non-discretionary rules. Here, the Sale Restrictions are simply conditions and qualifications on the commercial sale of firearms. They are laws of the same kind as the ten-day waiting period upheld in *McRorey*. For one thing, they do not ban the sale of any kind of guns at all. In fact, they do not even prohibit customers shopping out of state from acquiring a specific type of firearm. Customers are not prohibited from shopping for or purchasing a firearm from an out-of-state dealer. They simply must arrange to have the firearm shipped from the state of sale to their home state.[6] The lightness of the burden placed on customers here demonstrates that the Sale Restrictions are not an improper attempt by the Government to "shoehorn[ ] restrictions on purchase into functional prohibitions on keeping." *McRorey*, 99 F.4th at 838. Rather, they "backstop[ ] state licensing regimes by ensuring that individuals can[not] dodge their home-state's licensing requirements by simply obtaining a gun from out of state." *United States v. Libertad*, 681 F. Supp. 3d 102, 111 (S.D.N.Y. 2023). The modest delay in taking possession of an individual who purchases a firearm and slight increase in cost while out of state is akin to the ten-day delay upheld in *McRorey*. *See Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc) (upholding state shall-issue licensing regime despite both delay and increased cost).

The Court's decision is bolstered by a recent opinion issued by the Second Circuit in *United States v. Vereen*. No. 24-162-CR, 2025 WL 2394444 (2d Cir. Aug. 19, 2025). Like the Fifth Circuit, the Second Circuit had upheld the Sale Restrictions before *Bruen* was announced.

---

[6] It is evident to the Court that the Sale Restrictions may have the effect of potentially protecting customers from state prosecution. Many states have demonstratively different gun laws. A customer transporting a newly purchased firearm across multiple state lines might unknowingly violate one of the passthrough states' laws. The shipment of the firearm to a licensed dealer in the buyer's home state alleviates this concern.

12

*Id.* at *5; *see United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012). *Bruen* did not change the Second Circuit's analysis, as its *Decastro* decision was based not on means-end scrutiny but on a finding that the Sale Restrictions "did not implicate the Second Amendment at all." *Vereen*, 2025 WL 2394444, at *6. The Court reaffirmed its original holding, explaining that the Sale Restrictions "merely obligate[ ] individuals to generally comply with their state's firearm regulations by requiring in-state firearm acquisition, or out-of-state acquisition through a federally licensed in-state dealer." *Id.* That court also pointed out that Section 922(a)(3) "includes a plethora of safety valves" such as exceptions for inheritance and sporting. *Id.* The Court agrees with the reasoning of the Second Circuit.

### 3. The Sale Restrictions Lawfully Impose a Burden Needed to Protect the Integrity of State Gun Laws.

And the restrictions impose a reasonably proportional burden on the right to protect the integrity of state laws. Before the Sale Restrictions were passed, federal law had required dealers to have licenses, keep records, and to not transfer weapons to certain classes of people. Federal Firearms Act of 1938, Pub. L. No. 75-785, Ch. 850, 52 Stat. 1250 (repealed 1968). But Congress found that these laws failed to protect the integrity of state laws and to limit illegal firearms traffic. Omnibus Crime Control and Safe Streets Act of 1968, § 901(a)(1). So Congress found these conditions necessary to protect state laws and ensure arms did not fall into the wrong hands—after its reasonable assessment that the previous 30-year legal regime was unsuccessful. Otherwise, citizens will be able to avoid any regulations, such as background checks, required by their state of residence—an affront on state sovereignty.

## CONCLUSION

In short, the Court holds that the Sale Restrictions do not function as a *de facto* prohibition on possession but rather a reasonable commercial restriction enacted by Congress.[7] Consequently, the Court

---

[7] The judicial branch must tread carefully when it exercises authority in areas best left to the legislative branch. *See United States v. Butler*, 297 U.S. 1, 78–79, (1936) (Stone, J., dissenting) ("[W]hile unconstitutional exercise of

holds that the Sale Restrictions do not violate the Second Amendment.[8] Because the laws do not implicate the Second Amendment at step one, the Court need not undergo the historical analysis warranted by step two of the *Bruen* test. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 757 (2024) (Thomas, J., concurring) ("When a federal court decides an issue unnecessary for resolving a case or controversy, the Judiciary assumes authority beyond what the Constitution granted.").

Based on the foregoing, it is **ORDERED** that the Government's Motion is **GRANTED**, and the Plaintiffs' Motion is **DENIED.**

**SO ORDERED** this **30th day of September 2025.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

---

power by the executive and legislative branches of the government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint. For the removal of unwise laws from the statute books appeal lies not to the courts but to the ballot and to the processes of democratic government."). Rather, this Court agrees with the late Senator Orrin Hatch, who said, "[i]f a judge crosses the line between interpreting and making the law, he has crossed the line supporting his legitimate authority from the legislative branch's authority. Now, to me that's a very serious matter if we believe, as America's founders did, that the separation of powers—not just in theory or in textbook but in practice in the actual functioning of the government—is the linchpin of limited government and liberty." *Hearing on the Nomination of John Roberts to be Chief Justice of the Supreme Court Before the Senate Judiciary Committee*, 109th Cong. (2005) (statement of Sen. Orrin Hatch, member, S. Jud. Comm.).

[8] Thomas Jefferson warned: "One single object . . . [will merit] the endless gratitude of the society: that of restraining the judges from usurping legislation." *Letter from Thomas Jefferson to Edward Livingston* (Mar. 25, 1825), *in* 16 THE WRITINGS OF THOMAS JEFFERSON 112, 113 (Andrew A. Lipscomb & Albert Ellery Bergh Ed.) (1904). Rather than continuing to utilize precious resources challenging the Sales Restrictions in the Judicial Branch, perhaps a better avenue for Plaintiffs would be seeking to have the people's elected representatives in the Legislative Branch repeal them. *See Speaker Sam Rayburn, quoted in* Alfred Steinberg, SAM RAYBURN: A BIOGRAPHY 351 (1975) ("The American people, when properly appealed to, respond."). Or, as President Lyndon B. Johnson was fond of admonishing Congress: "Come now, let us reason together." John Bartlett, FAMILIAR QUOTATIONS 872 (15th ed. 1980).